THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STEVEN VANCE, *et al.*,

Plaintiffs,

v.

MICROSOFT CORPORATION,

Defendant.

No. 2:20-cv-01082-JCC-MAT

DEFENDANT MICROSOFT
CORPORATION'S MOTION TO
DISMISS

**NOTE ON MOTION CALENDAR**:
OCTOBER 9, 2020

**ORAL ARGUMENT REQUESTED**

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................. 1

FACTUAL BACKGROUND ................................................................ 3

    A.    The Illinois Biometric Information Privacy Act. ..................................... 3

    B.    The IBM DiF Dataset. ............................................................................. 4

    C.    Microsoft's Alleged Conduct. ................................................................ 5

ARGUMENT ..................................................................................... 6

I.    THE COURT SHOULD DISMISS PLAINTIFFS' BIPA CLAIMS. .............................. 6

    A.    BIPA Does Not Apply Extraterritorially to Microsoft's Alleged Conduct. .......... 6

    B.    Plaintiffs' BIPA Claims Violate the Dormant Commerce Clause. ...................... 9

        1.    Plaintiffs' Claims Impermissibly Attempt to Regulate Conduct Occurring Entirely Outside Illinois's Borders. ........................... 9

        2.    Plaintiffs' BIPA Claims Impermissibly Displace the Legislation and Policy Decisions Made by States Other Than Illinois. ................. 12

    C.    Plaintiffs Fail to State a Claim Under BIPA Sections 15(b) or 15(c). ................. 16

        1.    BIPA Does Not Apply to the Use of Photographs. ................................. 16

        2.    Section 15(b) Does Not Apply to the Passive Possession of Data by Third Parties Like Microsoft. .................................................... 19

        3.    Plaintiffs Fail to Plausibly Allege That Microsoft "Profited" From Their Biometrics and Thus Fail to Plead a Section 15(c) Claim. ........... 21

II.    THE COURT SHOULD DISMISS PLAINTIFFS' UNJUST ENRICHMENT CLAIM. ............................................................................................ 22

III.    PLAINTIFFS HAVE NO SEPARATE INJUNCTIVE RELIEF CLAIM. ..................... 24

CONCLUSION ..................................................................................... 24

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

## <u>TABLE OF AUTHORITIES</u>

2
                                                                                    **Page(s)**

3  **Cases**

4  *ACLU v. Johnson*,
       194 F.3d 1149 (10th Cir. 1999) ...................................................................15
5

6  *Am. Libraries Ass'n v. Pataki*,
       969 F. Supp. 160 (S.D.N.Y. 1997) .............................................................15

7  *Archdiocese of St. Louis v. Internet Entm't Grp., Inc.*,
       1999 WL 66022 (E.D. Mo. Feb. 12, 1999)..................................................16
8

9  *Ashcroft v. Iqbal*,
       556 U.S. 662 (2009)......................................................................................6
10

    *Avery v. State Farm Mut. Auto. Ins. Co.*,
11     835 N.E.2d 801 (Ill. 2005).........................................................................7, 9

12  *Bell Atl. Corp. v. Twombly*,
       550 U.S. 544 (2007)......................................................................................6
13

14  *Bernal v. ADP, LLC*,
       No. 2017-CH-12364, Order (Cook Cty. Ill. Cir. Ct. Aug. 23, 2019)................21, 22
15

16  *Cameron v. Polar Tech Indus., Inc. & ADP, LLC*,
       No. 2019-CH-000013, Tr. (DeKalb Cty. Ill. Cir. Ct. Aug. 23, 2019)   ..................21

17  *Chinatown Neighborhood Ass'n v. Harris*,
       794 F.3d 1136 (9th Cir. 2015) ......................................................................10
18

19  *Cleary v. Philip Morris Inc.*,
       656 F.3d 511 (7th Cir. 2011) ........................................................................23
20

21  *Cousineau v. Microsoft Corp.*,
       992 F. Supp. 2d 1116 (W.D. Wash. 2012)...........................................8, 23, 24

22  *In re D.W.*,
       827 N.E.2d 466 (Ill. 2005)...........................................................................21
23

24  *Dana Tank Container, Inc. v. Human Rights Comm'n*,
       687 N.E.2d 102 (Ill. App. Ct. 1997) .............................................................21
25

26  *Daniels Sharpsmart, Inc. v. Smith*,
       889 F.3d 608 (9th Cir. 2018) ........................................................................10

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

*Daniels-Hall v. Nat'l Educ. Ass'n*,
   629 F.3d 629 F.3d 992 (9th Cir. 2010) .................................................................8

*Edifecs Inc., v. TIBCO Software Inc.*,
   2011 WL 1045645 (W.D. Wash. Mar. 23, 2011) ................................................25

*Edwards v. JPMorgan Chase Bank, N.A.*,
   2011 WL 3516155 (W.D. Wash. Aug. 11, 2011) ................................................25

*In re Facebook Biometric Information Privacy Litigation*,
   185 F. Supp. 3d 1155 (N.D. Cal. 2016) .............................................................18

*Griffin v. Oceanic Contractors, Inc.*,
   458 U.S. 564 (1982) ...........................................................................................19

*Harbers v. Eddie Bauer, LLC*,
   415 F. Supp. 3d 999 (W.D. Wash. 2019) ...........................................................17

*Healy v. Beer Inst., Inc.*,
   491 U.S. 324 (1989) ................................................................................2, 10, 12

*Kelley v. Microsoft Corp.*,
   251 F.R.D. 544 (W.D. Wash. 2008) ...................................................................23

*L'Garde, Inc. v. Raytheon Space & Airborne Sys.*,
   805 F. Supp. 2d 932 (C.D. Cal. 2011) .................................................................4

*Landau v. CNA Fin. Corp.*,
   886 N.E.2d 405 (Ill. App. 2008) ..........................................................................7

*Monroy v. Shutterfly, Inc.*,
   2017 WL 4099846 (N.D. Ill. Sept. 15, 2017) ............................................. *passim*

*Mount v. PulsePoint, Inc.*,
   684 Fed. App'x 32 (2d Cir. 2017) .......................................................................24

*Namuwonge v. Kronos, Inc.*,
   418 F. Supp. 3d 279 (N.D. Ill. 2019) .................................................................21

*Nat'l Collegiate Athletic Ass'n v. Miller*,
   10 F.3d 633 (9th Cir. 1993) .........................................................................14, 15

*Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*,
   63 F.3d 652 (7th Cir. 1995) ...............................................................................14

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

MICROSOFT'S MOTION TO DISMISS - iii
(Case No. 2:20-cv-01082-JCC-MAT)

*Neals v. PAR Tech. Corp.*,
   419 F. Supp. 3d 1088 (N.D. Ill. 2019) ...................................................................9

*Patel v. Facebook, Inc.*,
   932 F.3d 1264 (9th Cir. 2019) ..............................................................7, 9, 19, 20

*People v. Hanna*,
   800 N.E.2d 1201 (Ill. 2003) ..............................................................................19

*Pooh-Bah Enter., Inc. v. Cnty. of Cook*,
   905 N.E.2d 781 (Ill. 2009) .................................................................................23

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
   442 F.3d 741 (9th Cir. 2006) ...............................................................................4

*Rivera v. Google, Inc.*,
   238 F. Supp. 3d 1088 (N.D. Ill. 2017) ................................................7, 9, 19, 20

*Rosenbach v. Six Flags Entm't Corp.*,
   129 N.E.3d 1197 (Ill. 2019) ..............................................................................19

*Sam Francis Found. v. Christies, Inc.*,
   784 F.3d 1320 (9th Cir. 2015) ...........................................................................11

*Seattle Prof'l Eng'g Employees Ass'n v. Boeing Co.*,
   139 Wn.2d 824 (2000) ......................................................................................24

*Sonoma Cty. Ass'n of Retired Employees v. Sonoma Cty.*,
   708 F.3d 1109 (9th Cir. 2013) ...........................................................................17

*Tarzian v. Kraft Heinz Foods Co.*,
   2019 WL 5064732 (N.D. Ill. Oct. 9, 2019)..........................................................9

*Vance et al. v. Amazon.com, Inc.*,
   W.D. Wash. No. 2:20-cv-01084-RAJ ..................................................................1

*Welborn v. Internal Revenue Serv.*,
   218 F. Supp. 3d 64, 78 (D.D.C. 2016) ..............................................................24


**Statutes**

740 ILCS 14/5..........................................................................................................3, 19

740 ILCS 14/10........................................................................................................3, 17

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

740 ILCS 14/15 ................................................................................................ *passim*

740 ILCS 14/20 .......................................................................................................4

RCW 19.375.010 ...............................................................................................13, 14

RCW 19.375.020 ...............................................................................................12, 13

RCW 19.375.020(1) ...................................................................................................12

**Other Authorities**

Federal Rule of Civil Procedure 11 ............................................................................7

Federal Rule of Civil Procedure 12(b)(6) ...........................................................2, 6, 11

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**INTRODUCTION**

Illinois residents Steven Vance and Tim Janecyk allege Microsoft violated the Illinois Biometric Information Privacy Act ("BIPA") when it downloaded an IBM-created dataset consisting of one million facial images, known as the Diversity in Faces Dataset ("DiF Dataset").[1]  IBM allegedly created this dataset in 2019 "for the purpose of improving the ability of facial recognition systems to fairly and accurately identify all individuals."  Dkt. 1, Complaint ("Compl.") ¶ 40.  Plaintiffs seek to hold Microsoft liable for penalties under BIPA even though they allege IBM—not Microsoft—included their images and biometric information in the dataset.

Plaintiffs do so by alleging they voluntarily uploaded their photographs many years ago to Flickr, a photo-sharing website.  They allege Flickr then made their images publicly available in a collection of 100 million photographs, from which IBM culled one million images to create the DiF Dataset.  Plaintiffs do ***not*** allege Microsoft (i) interacted with them or any other Illinois Flickr users; (ii) conducted any activity relevant to this lawsuit in Illinois; (iii) ever linked Plaintiffs' identities with their individual biometric information; or (iv) ever engaged in any transactions to profit from Plaintiffs' data.  They nevertheless contend BIPA governs Microsoft's out-of-state (i.e., Washington) conduct.  And they assert Microsoft violated BIPA by "collecting and obtaining individuals' biometric identifiers and information ... without providing the requisite written information and without obtaining the requisite written releases."  *Id.* ¶ 94.  They seek to bring these claims on behalf of a class of any other Illinois residents whose images appear in the IBM DiF Dataset.

---

[1] Plaintiffs Vance and Janecyk, represented by the same counsel, are pursuing a substantially identical putative class action against Amazon, claiming BIPA violations based on allegations that, like Microsoft, Amazon downloaded the DiF Dataset from IBM.  *See Vance et al. v. Amazon.com, Inc.*, W.D. Wash. No. 2:20-cv-01084-RAJ.  Microsoft understands Amazon is likewise filing a motion to dismiss the claims against it, asserting the same dismissal arguments Microsoft asserts in this motion.

MICROSOFT'S MOTION TO DISMISS - 1
(Case No. 2:20-cv-01082-JCC-MAT)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Plaintiffs fail to state a claim, and the Court should dismiss the Complaint with prejudice under Rule 12(b)(6), for the following reasons:

*First*, the BIPA claims (Counts I and II) fail because BIPA does not express clear intent to apply extraterritorially, as required for Illinois statutes to have such effect.  Thus, the statute could regulate Microsoft only if its BIPA-related conduct occurred primarily and substantially in Illinois.  But Plaintiffs fail to allege Microsoft engaged in ***any*** conduct in Illinois giving rise to BIPA liability.  Plaintiffs allege only that the IBM DiF Dataset, which Microsoft allegedly downloaded, included publicly-available online photographs of Vance and Janecyk, and that Microsoft conducts business in Illinois related to facial-recognition technology more generally.  This is plainly insufficient.  BIPA does not reach Microsoft's alleged conduct.

*Second*, applying BIPA to Microsoft's out-of-state conduct would violate the dormant Commerce Clause, which "precludes the application of a state statute" that has "the practical effect of ... control[ling] conduct beyond the boundaries of the State," "whether or not the commerce has effects within the State."  *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).  If Plaintiffs could state a BIPA claim against Microsoft, that would mean a business in Washington could not engage in an online transaction with a business in New York without subjecting itself to penalties in Illinois—even if the Washington business does nothing in Illinois relating to the transaction and the transaction complies with Washington law.  The dormant Commerce Clause bars such an outcome.

*Third*, even if BIPA applied (and it should not), Plaintiffs fail to state a claim under its plain language.  Neither Section 15(b) nor Section 15(c) of BIPA applies to biometric information derived from "photographs."  Section 15(b) also does not afford an action for mere passive possession of biometric identifiers or information.  And Plaintiffs fail to plausibly plead that Microsoft "profited" from their biometric identifiers or information and thus fail to state a Section 15(c) claim.

MICROSOFT'S MOTION TO DISMISS - 2
(Case No. 2:20-cv-01082-JCC-MAT)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1    *Fourth*, Plaintiffs fail to state an unjust enrichment claim (Count III) because they do

2    not plausibly allege (i) Microsoft was enriched by their biometric identifiers or biometric

3    information; (ii) they suffered any expense or loss; or (iii) they lack an adequate remedy at

4    law, given the alleged BIPA violation serves as the only basis for the unjust enrichment claim.

5        *Fifth*, Plaintiffs' "injunctive relief" claim (Count IV) amounts to nothing more than a

6    prayer for relief, not a claim, and should therefore be dismissed.

7                                **FACTUAL BACKGROUND**

8        **A.      The Illinois Biometric Information Privacy Act.**

9        The Illinois General Assembly enacted BIPA in 2008 to address the growing use of

10   biometric technology "in the business and security screening sectors" in Illinois. 740 ILCS

11   14/5(a).  The General Assembly found "[m]ajor national corporations ha[d] selected the City

12   of Chicago and other locations in [Illinois] as pilot testing sites for new applications of

13   biometric-facilitated financial transactions, including finger-scan technologies at grocery

14   stores, gas stations, and school cafeterias."  740 ILCS 14/5(b).  The Illinois legislature also

15   found that consumers had concerns about "use of biometrics when such information is tied to

16   finances" and were "deterred from partaking in biometric identifier-facilitated transactions,"

17   in part because of the "limited State law regulating the collection, use, safeguarding, and

18   storage of biometrics."  740 ILCS 14/5(d), (e).

19       BIPA addresses these concerns by regulating the collection, possession, and storage of

20   certain biometric identifiers and information, while expressly excluding coverage of other

21   data.  The statute defines "biometric identifier" using a short, exclusive list of personal data:

22   "'[b]iometric identifier' means a retina or iris scan, fingerprint, voiceprint, or scan of hand or

23   face geometry."  740 ILCS 14/10.  Section 15(b) requires private entities that "collect,

24   capture, purchase, receive through trade, or otherwise obtain a person's ... biometric identifier

25   or biometric information" to first (1) inform the person of that collection "in writing"; (2)

26   inform the person "in writing of the specific purpose and length of term" regarding the

MICROSOFT'S MOTION TO DISMISS - 3
(Case No. 2:20-cv-01082-JCC-MAT)

collection; and (3) obtain a "written release" from the person.  740 ILCS 14/15(b).  Section 15(c) further prohibits any private entity "in possession of a biometric identifier or biometric information" from "sell[ing], leas[ing], trad[ing], or otherwise profit[ing] from a person's ... biometric identifier or biometric information."  740 ILCS 14/15(c).

For negligent violations of BIPA, a plaintiff may obtain "liquidated damages of $1,000 or actual damages, whichever is greater," and for intentional or reckless violations of BIPA, a plaintiff may collect "liquidated damages of $5,000 or actual damages, whichever is greater."  740 ILCS 14/20(2).

### B.    The IBM DiF Dataset.

Plaintiffs Vance and Janecyk allege that, in 2008 and 2011, respectively, they uploaded photos of themselves to the photo-sharing website Flickr.  Compl. ¶¶ 60, 69.  Each alleges he uploaded his photos using a device in Illinois.  *Id*.

Plaintiffs contend that, in 2014, Yahoo!—Flickr's parent company at the time—released to the public approximately 100 million photos uploaded by Flickr users (the "Flickr Dataset").  *Id*. ¶ 29.  Oath Inc.—the current name of the entity formerly known as Yahoo!—is a Delaware corporation headquartered in Sunnyvale, California.[2]  Plaintiffs do not allege any interaction or relationship between Flickr and Microsoft.

Plaintiffs next assert IBM in 2019 created the DiF Dataset "consisting of one million images culled from the Flickr Dataset ... for the purpose of improving the ability of facial recognition systems to fairly and accurately identify all individuals."  *Id*. ¶ 40.  Plaintiffs

---

[2] *See* State of Delaware, *Department of State: Division of Corporations, Business Search Results for Oath Inc.*, https://icis.corp.delaware.gov/ecorp/entitysearch/NameSearch.aspx (last accessed Sept. 10, 2020).  The Court may take judicial notice of information posted on a state government website because it is "readily verifiable and, therefore, the proper subject of judicial notice."  *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746, n.6 (9th Cir. 2006); *see also L'Garde, Inc. v. Raytheon Space & Airborne Sys.*, 805 F. Supp. 2d 932, 938 (C.D. Cal. 2011) (taking judicial notice of "Business Entity Detail" search result from Secretary of State website submitted in support of motion to dismiss).

MICROSOFT'S MOTION TO DISMISS - 4
(Case No. 2:20-cv-01082-JCC-MAT)

contend IBM included their publicly available Flickr photos in the DiF Dataset, and in creating the dataset, IBM "scanned the facial geometry of each image contained in the dataset" and created "biometric identifiers" and "biometric information" from the photographs. *Id.* ¶ 41. According to Plaintiffs, the IBM DiF Dataset included a "'comprehensive set of annotations of intrinsic facial features that includes craniofacial distances, areas and ratios, facial symmetry and contrast, skin color, age and gender predictions, subjective annotations, and pose and resolution.'" *See id.* ¶¶ 39–41.

IBM is a New York corporation with its headquarters in New York, New York.[3] Plaintiffs do not allege IBM created the DiF Dataset in Illinois, or even that IBM knew the culled images included photographs of Illinois residents. Nevertheless, they allege BIPA regulates the purported "biometric identifiers" and "biometric information" IBM allegedly created from the Flickr photographs. *Id.* ¶¶ 41–44. Plaintiffs further allege IBM made the DiF Dataset available to other companies. *Id.* ¶¶ 44, 47.

**C.     Microsoft's Alleged Conduct.**

Plaintiffs assert Microsoft "applied for and obtained the Diversity in Faces Dataset from IBM." *Id.* ¶ 55. Plaintiffs do ***not*** plead facts showing Microsoft's alleged acquisition of the IBM DiF Dataset had any connection whatsoever with Illinois. Plaintiffs do not claim they personally uploaded photos to Microsoft servers, used Microsoft software, services, or technology, or ever communicated or interacted with Microsoft. Nor do Plaintiffs allege any of Microsoft's actions in purported violation of BIPA—e.g., "collecting, capturing and otherwise obtaining the[ir] biometric identifiers and information" and/or "profit[ing]" from that data, *id.* ¶¶ 58, 65–66, 73–74, 101—occurred in Illinois. Microsoft's only alleged connections to Illinois are: (1) allegedly possessing IBM's DiF Dataset of publicly-available

---

[3] *See* New York State, *Department of State, Division of Corporations, State Records & UCC, Search The Corporation and Business Entity Database Results for International Business Machines Corporation*, https://www.dos.ny.gov/corps/bus_entity_search.html (last accessed Sept. 10, 2020).

MICROSOFT'S MOTION TO DISMISS - 5
(Case No. 2:20-cv-01082-JCC-MAT)

photos of approximately one million individuals, some undetermined number of which purportedly include Illinois residents, *id.* ¶¶ 63, 71; and (2) allegedly conducting "extensive business within Illinois related to the facial recognition products it unlawfully developed"—in some unspecified way—"using Plaintiffs' ... biometric identifiers and information." *Id.* ¶ 59.

## ARGUMENT

Rule 12(b)(6) requires dismissal when a plaintiff "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To plead a viable cause of action, the allegations must transcend the "speculative," "conceivable," and "possible," and must "state a claim that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57, 566–67, 570 (2007). The Court must disregard "legal conclusions" and "conclusory statements," and scrutinize factual allegations to ensure they are more than "merely consistent with a defendant's liability." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–79 (2009).

## I.   THE COURT SHOULD DISMISS PLAINTIFFS' BIPA CLAIMS.

The Court should dismiss Plaintiffs' BIPA claims because the claims violate Illinois's extraterritoriality doctrine and the dormant Commerce Clause, and fail to state a claim under BIPA's plain language.

### A.   BIPA Does Not Apply Extraterritorially to Microsoft's Alleged Conduct.

Under Illinois law, "a statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 852 (Ill. 2005) (citation omitted). "[N]one of BIPA's express provisions indicates that the statute was intended to have extraterritorial effect." *Monroy v. Shutterfly, Inc.*, 2017 WL 4099846, at *5 (N.D. Ill. Sept. 15, 2017). Because BIPA "was not intended to and does not have extraterritorial application," "asserted violations of [BIPA] must have taken place in Illinois" to fall within the statute. *Rivera v. Google, Inc.*, 238 F. Supp. 3d 1088, 1100, 1104 (N.D. Ill. 2017). The statute requires an assessment "as to where the essential elements of a BIPA violation take place." *Patel v. Facebook, Inc.*, 932 F.3d

MICROSOFT'S MOTION TO DISMISS - 6
(Case No. 2:20-cv-01082-JCC-MAT)

1   1264, 1276 (9th Cir. 2019).

2   Microsoft thus could be subject to BIPA only if "the majority of circumstances

3   relating to the alleged violation of the [statute]" occurred in Illinois.  *Landau v. CNA Fin.*

4   *Corp.*, 886 N.E.2d 405, 409 (Ill. App. 2008).  Put another way, for BIPA to apply to

5   Microsoft, "the circumstances relating to the claim [must have] occur[ed] primarily and

6   substantially" in Illinois.  *Avery*, 835 N.E.2d at 853; *see also Patel*, 932 F.3d at 1275–76

7   (applying "primarily and substantially" test to BIPA claim).  Plaintiffs' claims fail this test.

8   The primary and substantial elements of the Section 15(b) claim would involve

9   Microsoft's alleged "collection" of Plaintiffs' biometric data from IBM without prior notice to

10  them and without their written consent.  *See* Compl. ¶ 94; 740 ILCS 14/15(b).  The elements

11  of Plaintiffs' Section 15(c) claim would involve Microsoft's alleged "profit[ing]" from their

12  biometric data.  *See* Compl. ¶ 101; 740 ILCS 14/15(c).  But Plaintiffs do not allege Microsoft

13  engaged in any of this conduct in Illinois—and they could not so allege consistent with their

14  obligations under Rule 11.  Fed. R. Civ. P. 11.

15  Microsoft's alleged possession of photographs of Illinois residents, Compl. ¶¶ 63, 71,

16  even if true, would ***not*** show it collected biometric information or profited from that

17  information in Illinois.  On the contrary, Plaintiffs allege Microsoft obtained the DiF Dataset

18  online from IBM, a New York corporation, for free.  Compl. ¶¶ 49, 55, 56.  And Plaintiffs fail

19  to allege this non-commercial transaction occurred "primarily and substantially" in Illinois—

20  something, again, they would have no good faith basis to allege.

21  Plaintiffs also allege Microsoft "(i) sell[s] its facial recognition products to third-party

22  clients through an Illinois-based vendor; (ii) work[s] closely with an Illinois-based business to

23  build new applications for its facial recognition technology; and (iii) work[s] with the

24  University of Illinois, among others, to build and promote a 'digital transformation institute'

25  aimed at 'accelerating the application of artificial intelligence' throughout business and

26  society."  Compl. ¶ 59.  But Plaintiffs' conclusory allegations do not plausibly explain how

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

these activities have any connection to the IBM DiF Dataset.  In particular, Plaintiffs fail to allege the DiF Dataset, released in 2019, played any role in Microsoft's development of any facial-recognition technology purportedly licensed or sold in Illinois—let alone photographs *from Illinois residents* specifically were used in that development.

In alleging Microsoft "work[ed] with the University of Illinois, among others, to build and promote a 'digital transformation institute' aimed at 'accelerating the application of artificial intelligence' throughout business and society," *id.*, Plaintiffs quote (without citation) a March 2020 article from the Microsoft News Center.  *See C3.ai, Microsoft, and leading universities launch C3.ai Digital Transformation Institute* (Mar. 26, 2020), Microsoft News Center, https://news.microsoft.com/2020/03/26/c3-ai-microsoft-and-leading-universities-launch-c3-ai-digital-transformation-institute/ (last accessed September 11, 2020).  But the "artificial intelligence" discussed in the article has *nothing* to do with facial-recognition technology; rather, it involves the use of AI to mitigate COVID-19's spread.  *See id*.  (Because Plaintiffs quote this article, the Court may consider it on this motion.  *See Daniels-Hall*, 629 F.3d at 998–99 (considering documents referenced in complaint in ruling on motion to dismiss).)  Plaintiffs have alleged no plausible connection between Illinois and Microsoft's alleged download of the IBM DiF Dataset.

The few cases that have found it premature to determine at the motion to dismiss stage whether a plaintiff's claims would require an extraterritorial application of BIPA do not apply here.  In particular, in each of those cases an Illinois plaintiff allegedly uploaded a photo *directly* to the *defendant's* systems from a computer or device located in Illinois, so the defendant's collection arguably occurred in Illinois.  *See, e.g., Patel*, 932 F.3d at 1268, 1276 (Illinois-based Facebook users uploaded their photos to Facebook from Illinois); *Monroy*, 2017 WL 4099846, at *6 (plaintiff "allege[d] that [his] photo was uploaded to Shutterfly's website from a device that was physically located in Illinois and had been assigned an Illinois-based IP address"); *Rivera*, 238 F. Supp. 3d at 1101 (plaintiff's "photographs were allegedly

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

'automatically uploaded in Illinois to [Google's] cloud-based Google Photos service . . . from an Illinois-based Internet Protocol ('IP') address'" (citation omitted)).  Here, by contrast, Plaintiffs allege they uploaded their photos from their devices in Illinois directly to *Flickr*; they do not allege they uploaded ***anything*** to Microsoft (or even IBM), much less that they did so in Illinois.  Indeed, Plaintiffs do not allege they ever interacted with Microsoft at all—in Illinois or anywhere else—or that Microsoft had any interactions in Illinois showing supposed collection, use, or profit from the IBM DiF Dataset.

In short, the Complaint does not allege Microsoft's purported conduct occurred "primarily and substantially" in Illinois, as required to state a claim under Illinois law.  *Avery*, 835 N.E.2d at 853; *see also Neals v. PAR Tech. Corp.*, 419 F. Supp. 3d 1088, 1091–92 (N.D. Ill. 2019) (dismissing BIPA complaint with leave to amend where court was "unable to reasonably infer from the complaint that [plaintiff's] fingerprint was collected in Illinois"); *Tarzian v. Kraft Heinz Foods Co.*, 2019 WL 5064732, at *3 (N.D. Ill. Oct. 9, 2019) (dismissing Illinois consumer fraud claims under Rule 12(b)(6) based on absence of Illinois connection).  The Complaint therefore fails to state a claim against Microsoft under BIPA.

**B.     Plaintiffs' BIPA Claims Violate the Dormant Commerce Clause.**

**1.     Plaintiffs' Claims Impermissibly Attempt to Regulate Conduct Occurring Entirely Outside Illinois's Borders.**

Similar to Illinois's extraterritoriality doctrine, the U.S. Constitution ensures a state regulates only the conduct that that state has a substantial interest in controlling.  Article I, section 8 gives Congress the exclusive power to regulate commerce "among the several states."  This express grant of power implicitly "limit[s] ... the authority of the States to enact legislation affecting interstate commerce" and "precludes the application of a state statute" that has "the practical effect of ... control[ling] conduct beyond the boundaries of the State ... whether or not the commerce has effects within the State."  *Healy*, 491 U.S. at 336 n.1.

MICROSOFT'S MOTION TO DISMISS - 9
(Case No. 2:20-cv-01082-JCC-MAT)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1    "[T]he dormant Commerce Clause . . . has at least two emanations": (1) when a state

2    statute "discriminates against interstate commerce, or when its effect is to favor in-state

3    economic interests over out-of-state interests"; and (2) "direct regulation emanation"—i.e.,

4    "when a state law directly affects transactions that take place across state lines or entirely

5    outside of the state's borders." *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 614–15 (9th

6    Cir. 2018) (quoting *S.D. Myers, Inc. v. City & County of San Francisco*, 253 F.3d 461, 467

7    (9th Cir. 2001)).  If a state statute directly regulates conduct "wholly outside of the state's

8    borders," the statute is "struck down ... without further inquiry." *Chinatown Neighborhood*

9    *Ass'n v. Harris*, 794 F.3d 1136, 1145–46 (9th Cir. 2015) (citation omitted).

10    Because Plaintiffs do not allege Microsoft engaged in ***any*** relevant conduct in Illinois,

11    the "practical effect" of Plaintiffs' BIPA claims would be to allow Illinois to control conduct

12    entirely beyond its boundaries.  Plaintiffs' claims therefore violate the "direct regulation"

13    emanation of the dormant Commerce Clause.  *See, e.g.*, *Daniels Sharpsmart, Inc.*, 889 F.3d at

14    614–15  (California Medical Waste Management Act likely violated dormant Commerce

15    Clause by "attempt[ing] to reach beyond the borders of California [to] control transactions

16    that occur wholly outside of the State after ... medical waste ... has been removed from the

17    State"); *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) ("easily

18    conclud[ing] that" dormant Commerce Clause was violated by use of California statute to

19    regulate terms of art sales outside the state simply because seller resided in California).

20    *Christies* is instructive.  That case involved California's Resale Royalty Act, which

21    required a seller of fine art to pay the artist a 5% royalty "if the seller resides in California or

22    the sale takes place in California." *Id.* (citation omitted).  Various artists sued auction houses

23    and an online retailer for violating the Royalty Act by failing to pay the required royalties on

24    fine art sales, alleging "some sales took place in California and that other sales took place

25    outside California but on behalf of a seller who is a resident of California." *Id.* at 1322.  The

26    Ninth Circuit affirmed the district court's Rule 12(b)(6) dismissal of the plaintiffs' claims:

MICROSOFT'S MOTION TO DISMISS - 10
(Case No. 2:20-cv-01082-JCC-MAT)

[The] Royalty Act requires the payment of royalties to the artist after a sale of fine art whenever "the seller resides in California *or* the sale takes place in California." Defendants challenge the first clause because it regulates sales that take place outside California. ***Those sales have no necessary connection with the state other than the residency of the seller***. For example, if a California resident has a part-time apartment in New York, buys a sculpture in New York from a North Dakota artist to furnish her apartment, and later sells the sculpture to a friend in New York, the Act requires the payment of a royalty to the North Dakota artist – even if the sculpture, the artist, and the buyer never traveled to, or had any connection with, California. ***We easily conclude that the royalty requirement, as applied to out-of-state sales by California residents, violates the dormant Commerce Clause***. . . .

*Id.* at 1323–24 (emphasis added) (internal citations omitted).

Plaintiffs' BIPA claims present analogous circumstances: like the California-based art sellers in *Christies*, Plaintiffs' Illinois residency does not allow them to use BIPA to regulate the transmission of data between two non-Illinois entities (*i.e.*, IBM and Microsoft) simply because some of the data purportedly relates to Illinois residents.

Courts that have found dormant Commerce Clause challenges premature at the pleading stage in BIPA cases have done so based on very different allegations. In finding Shutterfly's dormant Commerce Clause argument premature at the pleading stage, for example, the *Monroy* court emphasized plaintiff's "suit, as well as his proposed class, is confined to individuals whose biometric data was obtained from photographs ***uploaded to Shutterfly in Illinois***." 2017 WL 4099846, at *7 (emphasis added). As a result, "[a]pplying BIPA in this case would not entail any regulation of Shutterfly's gathering and storage of biometric data obtained outside of Illinois." *Id.* By contrast, based on the allegations in the Complaint here, "applying BIPA in this case ***would*** [] entail [] regulation of [Microsoft's alleged] gathering and storage of biometric data obtained outside of Illinois" because Plaintiffs do not allege they uploaded their photographs to Microsoft, much less to Microsoft (or IBM) in Illinois. *See id.* (emphasis added).

MICROSOFT'S MOTION TO DISMISS - 11
(Case No. 2:20-cv-01082-JCC-MAT)

### 2.       Plaintiffs' BIPA Claims Impermissibly Displace the Legislation and Policy Decisions Made by States Other Than Illinois.

The dormant Commerce Clause also prevents "inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 337.  This has particular application where, as here, extraterritorial application of Illinois law would ***displace*** the inconsistent policies of other states, including Washington, where Microsoft is incorporated and has its principal place of business.

Washington has its own Biometric Privacy Law, which applies only to the use and collection of biometric information for "commercial purposes."  RCW 19.375.020(1). Plaintiffs do not allege Microsoft violated the Washington law.  They do not allege Microsoft used their biometrics for a "[c]ommercial purpose" as narrowly defined in Washington:  "a purpose in furtherance of the sale or disclosure to a third party of a biometric identifier for the purpose of marketing of goods or services when such goods or services are unrelated to the initial transaction in which a person first gains possession of an individual's biometric identifier."  RCW 19.375.010(4).  Further, Washington's law defines "[b]iometric identifier" as "data generated by automatic measurements of an individual's biological characteristics . . . used to identify a specific individual," but specifically excludes "a ***physical or digital photograph . . . or data generated therefrom***" from the definition.  RCW 19.375.010(1) (emphasis added).  In other words, Washington's law specifically ***excludes*** from its scope the facial-recognition technology alleged in the Complaint.  *See* Compl. ¶¶ 41–44 (alleging "biometric identifiers and information" in IBM's DiF Dataset were obtained from photos).

Washington's and Illinois's statutes not only differ in reach, but also establish inconsistent requirements.  Illinois imposes notice and consent requirements on any businesses that "collect, capture, purchase, receive through trade, or otherwise obtain a person's ... biometric identifier or biometric information," without regard to the purpose of the collection.  740 ILCS 14/15(b).  In contrast, Washington requires notice and consent only to

MICROSOFT'S MOTION TO DISMISS - 12
(Case No. 2:20-cv-01082-JCC-MAT)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1   "enroll" biometric information in a database—which "enrollment" activity Plaintiffs do not

2   allege Microsoft has engaged in—involving "captur[ing] a biometric identifier of an

3   individual, convert[ing] it into a reference template that cannot be reconstructed into the

4   original output image, and stor[ing] it in a database that matches the biometric identifier to a

5   specific individual." RCW 19.375.020; RCW 19.375.010(5). Moreover, Washington law

6   regulates the storage of biometric data only for a narrowly defined type of "commercial

7   purpose," i.e., "in furtherance of the sale or disclosure to a third party of a biometric identifier

8   for the purpose of marketing of goods or services." RCW 19.375.010(4). As a result, the

9   Washington law does not reach Microsoft's conduct as alleged in the Complaint. Further,

10   were the Court to interpret BIPA as applying to information obtained from photos (which it

11   should not, for reasons explained below), the Illinois law would again conflict with

12   Washington law, given Washington's explicit decision not to regulate a private entity's use of

13   "data generated" from "a physical or digital photograph." RCW 19.375.010(1).

14         Allowing Plaintiffs' BIPA claims to proceed despite these differences between the

15   Washington Biometric Privacy Law and BIPA would effectively allow Illinois to make policy

16   and legislative decisions for Washington, when Washington struck a different balance

17   regarding biometric privacy. While Plaintiffs may argue the laws do not "conflict" because a

18   company could simultaneously comply with both statutes, it could only do so by complying

19   with the stricter statute (BIPA)—a result that would effectively "forc[e] [Washington] to alter

20   [its] regulations to conform with the conflicting legislation"—i.e., BIPA. *Nat'l Solid Wastes*

21   *Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 660 n.9 (7th Cir. 1995).

22         The dormant Commerce Clause is not violated only where it is logically impossible to

23   comply with the laws of different states. In *National Collegiate Athletic Association v. Miller*,

24   10 F.3d 633 (9th Cir. 1993), for example, Nevada's statute "require[d] any national collegiate

25   athletic association to provide a Nevada institution, employee, student-athlete, or booster who

26   is accused of a rules infraction" with "procedural due process protections," many of which

MICROSOFT'S MOTION TO DISMISS - 13
(Case No. 2:20-cv-01082-JCC-MAT)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

were "not included in the NCAA enforcement program." *Id*. at 637.  The Nevada statute did

not literally "conflict" with NCAA rules or the laws of other states; it was simply stricter in

that it required additional protections.  The Ninth Circuit nonetheless held the statute violated

the dormant Commerce Clause, and explained what is meant by states having "inconsistent

obligations":

> [S]uppose that state X required proof of an infraction beyond a reasonable doubt, while state Y only required clear and convincing evidence, and state Z required infractions to be proven by a preponderance of the evidence.  Given that the NCAA must have uniform enforcement procedures in order to accomplish its fundamental goals, its operation would be disrupted because it could not possibly comply with all three statutes.  ***Nor would it do to say that it need only comply with the most stringent burden of persuasion (beyond a reasonable doubt), for a state with a less stringent standard might well consider its standard a maximum as well as a minimum***.  The serious risk of inconsistent obligations wrought by the extraterritorial effect of the Statute demonstrates why it constitutes a per se violation of the Commerce Clause.

*Id.* at 639–40 (emphasis added).

Applied here, BIPA and the Washington Biometric Privacy Law are similarly

inconsistent because the "state with a less stringent" biometric privacy law—i.e.,

Washington—"might well consider its standard a maximum as well as a minimum."  For

instance, perhaps not wanting to hamper research and development in a state known for

technological innovation, the Washington legislature may have consciously narrowed the

scope of its law so companies do not cease technological development over fears of liability.

The dormant Commerce Clause protects businesses engaged in interstate commerce

from precisely this kind of inconsistency between state statutes, which can "easily subject the

[defendant] to conflicting requirements."  *See, e.g.*, *id.* at 639.  This principle is particularly

important in the context of transactions over the Internet, such as Microsoft's alleged

download of the IBM DiF Dataset.  "[C]ourts have long recognized that certain types of

commerce demand consistent treatment," and "[t]he Internet represents one of those areas":

"[r]egulation by any single state can only result in chaos, because at least some states will

MICROSOFT'S MOTION TO DISMISS - 14
(Case No. 2:20-cv-01082-JCC-MAT)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1    likely enact laws subjecting Internet users to conflicting obligations." *Am. Libraries Ass'n v.*

2    *Pataki*, 969 F. Supp. 160, 181 (S.D.N.Y. 1997); *see also ACLU v. Johnson*, 194 F.3d 1149,

3    1162 (10th Cir. 1999).  At the very least, the "massive liability brought on by conflicting

4    applicable law could chill ... the rapidly expanding field of Internet commerce." *Archdiocese*

5    *of St. Louis v. Internet Entm't Grp., Inc.*, 1999 WL 66022, at *3 (E.D. Mo. Feb. 12, 1999).

6         Applying Illinois's BIPA law to regulate an online transaction through which

7    Microsoft, a Washington company, allegedly downloaded data from IBM, a New York-based

8    company, would burden interstate commerce and violate the dormant Commerce Clause.  *See*

9    *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1285–86 (W.D. Wash. 2012)

10   (Washington statute likely violated dormant Commerce Clause because, among other things,

11   it would regulate "advertisement[s] … occurring entirely outside of the state," and the

12   statute's proposed "screening process would constitute a significant and costly change to …

13   corporations that have little to no connection with the State of Washington" and a "burden

14   [that] would be exponentially exacerbated if every state were permitted to legislate its own

15   requirements").  Microsoft's alleged download of the DiF Dataset, which IBM created "for

16   the purpose of improving the ability of facial recognition systems to fairly and accurately

17   identify all individuals," Compl. ¶ 40, would pass muster under Washington law.  To apply

18   BIPA to govern transactions of this nature would adversely affect businesses and universities

19   across the country, who could be forced to stop research into facial recognition using any

20   dataset that might contain a small percentage of images of Illinois residents.  *See, e.g.*, Ira

21   Kemelmacher-Shlizerman et al., *The MegaFace Benchmark: 1 Million Faces for Recognition*

22   *at Scale*, UNIVERSITY OF WASHINGTON (2015),

23   http://megaface.cs.washington.edu/KemelmacherMegaFaceCVPR16.pdf, at § 3 (explaining

24   University of Washington's "MegaFace" facial-recognition research project made use of

25   "Yahoo's 100M Flickr set").  The dormant Commerce Clause exists precisely to prevent this

26   burden on interstate commerce.

MICROSOFT'S MOTION TO DISMISS - 15
(Case No. 2:20-cv-01082-JCC-MAT)

**C.**      **Plaintiffs Fail to State a Claim Under BIPA Sections 15(b) or 15(c).**

Even if BIPA could apply to Microsoft's alleged conduct (and it does not), the claims would still fail because Plaintiffs state no claim under Sections 15(b) or (c), as BIPA does not reach photographs.  Further, Plaintiffs improperly rely on mere passive possession of biometric identifiers or information, and do not plausibly plead Microsoft "profited" from their biometric identifiers or information.

**1.      BIPA Does Not Apply to the Use of Photographs.**

Plaintiffs fail to state a claim under either BIPA Section 15(b) or 15(c) because, under the statute's plain language, it does not apply to photographs or identifiers derived from photographs.  In enacting BIPA, the Illinois legislature created two categories of covered biometric data: (1) original sources of information about a person ("biometric identifiers"— defined as a "retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry"); and (2) data extracted or derived from those sources ("biometric information"—defined as "information . . . based on an individual's biometric identifier").  740 ILCS 14/10.  The statute specifically ***excludes*** photographs from the definition of "biometric identifier."  And because "biometric information" includes ***only*** information based on a "biometric identifier," "information derived from" photographs necessarily cannot be "biometric information."  *Id.*

In short, the Illinois legislature went out of its way to exclude both photographs and information derived from photographs from BIPA's scope.  The alleged "comprehensive set of annotations of intrinsic facial features" IBM allegedly obtained from Plaintiffs' Flickr photos and made available to Microsoft (Compl. ¶¶ 41, 55) are therefore expressly excluded from the statutory definitions of "biometric identifier" and "biometric information."

The legislative history confirms BIPA's limited purpose.  As BIPA moved toward passage, legislators narrowed the definitions of "biometric identifier" and "biometric information."  The first Senate version defined "biometric identifier" broadly: "Examples of biometric identifiers ***include, but are not limited to***[,] iris or retinal scans, fingerprints,

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

voiceprints, and **records** of hand or facial geometry." Sen. Bill 2400, § 10 (Feb. 14, 2008) (emphasis added) (attached as **Exhibit A**).[4]  And although the definition of "biometric identifier" always excluded "photographs," the original definition of "biometric information" did not exclude information **derived from** photographs.  *Id.*  The next proposal was even broader: "biometric identifier" included "records or scans of hand geometry, facial geometry, or **facial recognition**."  Sen. Am. to Sen. Bill 2400, § 10 (Apr. 11, 2008) (emphasis added) (attached as **Exhibit B**).

But that proposal was rejected, and the House offered a substantially narrower version: it (a) changed the definition of "biometric identifiers" from an open-ended set of "[e]xamples" to a narrow list of enumerated sources; (b) removed the broad term "records" of hand or face geometry; and (c) excluded from the definition of "biometric information" all "information derived from items or procedures excluded under the definition of biometric identifiers." House Am. to Sen. Bill 2400, § 10 (May 28, 2008) (attached as **Exhibit C**).  The legislature enacted this narrower version of BIPA and expressly declined (a) to include a "record" of facial geometry in the definition of biometric identifier, (b) to regulate all forms of "facial recognition," or (c) to allow information derived from photographs to slip into the definition of "biometric information."  This reflects a clear intent to regulate only a narrow set of technologies—and to exclude a host of others, including all forms of facial recognition derived from photographs.

Although some courts have declined to dismiss BIPA complaints where plaintiffs relied on the application of facial-recognition technology to photos, Microsoft respectfully submits those cases were wrongly decided, and this Court should decline to follow them.  For

---

[4] The Court may take judicial notice of the legislative history attached as **Exhibits A–C**.  *See, e.g., Sonoma Cty. Ass'n of Retired Employees v. Sonoma Cty.*, 708 F.3d 1109, 1120 n.8 (9th Cir. 2013) (granting motion to take judicial notice of legislative history); *Harbers v. Eddie Bauer, LLC*, 415 F. Supp. 3d 999, 1007 n.5 (W.D. Wash. 2019) ("Information published on government websites, including legislative history, is a proper subject of judicial notice.").

MICROSOFT'S MOTION TO DISMISS - 17
(Case No. 2:20-cv-01082-JCC-MAT)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1    example, the court in *In re Facebook Biometric Information Privacy Litigation*, 185 F. Supp.

2    3d 1155, 1171 (N.D. Cal. 2016), concluded "'[p]hotographs' is better understood to mean

3    paper prints of photographs, not digitized images stored as a computer file and uploaded to

4    the Internet."  But this reading cannot be reconciled with the commonly understood meaning

5    of "photograph" when the statute was passed in 2008.  By 2006, even the Oxford English

6    Dictionary defined "photograph" as "[a] picture made using a camera in which an image is

7    focused on to sensitive material and then made visible and permanent by chemical treatment;

8    (later also) ***a picture made by focusing an image and then storing it digitally***."  Oxford

9    English Dictionary (Mar. 2006), *available at*

10   https://www.oed.com/view/Entry/142818?rskey=8jt7S7&result=1&isAdvanced=false#eid

11   (emphasis added); *see also* Webster's Dictionary 373 (2008 ed.) ("photography" means "the

12   art or process of producing images on a sensitive surface (as film or a CCD chip [a form of

13   technology used in digital imaging] by the action of light") (attached as **Exhibit D**).

14          A statutory term should be interpreted "consistent with standard definitions ... found in

15   dictionaries, which [courts] may consult when attempting to ascertain the plain and ordinary

16   meaning."  *Rosenbach v. Six Flags Entm't Corp.*, 129 N.E.3d 1197, 1205 (Ill. 2019).  By

17   interpreting "[p]hotographs" to mean only "paper prints of photographs, not digitized

18   images," 185 F. Supp. 3d at 1171, the court in *Facebook* ignored the "plain and ordinary

19   meaning" of "photographs."  The courts' reasoning in *Monroy* and *Rivera* is similarly

20   unsound.  Those cases did not properly account for BIPA Section 5, which makes clear the

21   statute is intended to regulate "biometric identifier-facilitated ***transactions***," such as those that

22   occur "at grocery stores, gas stations, and school cafeterias"—all intrinsically ***in-person***

23   activities.  740 ILCS 14/5(b)–(e) (emphasis added).  Indeed, the statute gives several

24   examples of the activities it regulates, and ***all*** involve in-person activities in which biometric

25   information may be captured.  *See id.*

26          The Court should also reject the reasoning of *Facebook*, *Monroy*, and *Rivera* because

MICROSOFT'S MOTION TO DISMISS - 18
(Case No. 2:20-cv-01082-JCC-MAT)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

that reasoning leads to absurd results.  "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."  *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575 (1982); *see also People v. Hanna,* 800 N.E.2d 1201, 1207–09 (Ill. 2003) (rejecting statutory construction leading to "absurd result" that regulated entity would be unable to comply with the statute's requirements).  For example, the Complaint cites an article noting researchers have used facial-recognition technology "to identify the portraits of unknown soldiers in Civil War photographs taken in the 1860s."  Compl. ¶ 54 n.15 (quoting Brad Smith, *Facial recognition: It's time for action* (Dec. 6, 2018), Microsoft, https://blogs.microsoft.com/on-the-issues/2018/12/06/facial-recognition-its-time-for-action/).  Under the reasoning of *Facebook*, *Monroy*, and *Rivera*, using facial-recognition technology to scan soldiers' facial features for identification purposes leads to the creation of "biometric information," meaning a private entity cannot create this data without the subject's "written release."  740 ILCS 14/15(b).  But a private entity obviously cannot obtain a "written release" from a Civil War veteran in an 1863 photo, and it begs credulity to assume the Illinois legislature meant for BIPA to prohibit such activity.  This illustration, in addition to BIPA's "written release" requirement, shows BIPA contemplates in-person transactions involving use of biometric technology, not the creation of biometric data from a static image of an unidentified person.

## 2.   Section 15(b) Does Not Apply to the Passive Possession of Data by Third Parties Like Microsoft.

BIPA Section 15(b) imposes the following requirements on private entities before they can collect an individual's biometric information: (1) inform the individual "in writing that a biometric identifier or biometric information is being collected"; (2) inform the individual "in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected"; and (3) receive "a written release executed by the subject." 740 ILCS 14/15(b).  Unlike BIPA Sections 15(a), (c), (d), and (e)—which are triggered

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

through passive "possession"—only *actions* trigger Section 15(b), i.e., the private entity must "collect, capture, purchase, receive through trade," or "obtain" biometric information.  740 ILCS 14/15.  Section 15(b) therefore does not impose any requirements on entities that merely "possess[]" biometric information, but only on entities who actively "collect" biometric information.  Had the legislature meant to bring all entities who merely "possess" biometrics within Section 15(b)'s purview, it could have explicitly done so—as it did in Sections 15(a), (c), (d), and (e).  *See, e.g.*, *Dana Tank Container, Inc. v. Human Rights Comm'n*, 687 N.E.2d 102, 104 (Ill. App. Ct. 1997) ("Where the legislature uses certain words in one instance and different words in another, it intended different results."); *accord In re D.W.*, 827 N.E.2d 466, 479 (Ill. 2005).

This textual difference confirms Section 15(b) does not apply to the conduct alleged here.  Plaintiffs do not allege Microsoft collected or obtained biometric information directly from any individual, much less these Plaintiffs.  *See, e.g.*, *Cameron v. Polar Tech Indus., Inc. & ADP, LLC*, No. 2019-CH-000013, Tr. at 29–36 (DeKalb Cty. Ill. Cir. Ct. Aug. 23, 2019) (dismissing Section 15(b) claim against third-party timekeeping vendor) (attached as **Exhibit E**); *Bernal v. ADP, LLC*, No. 2017-CH-12364, Order at 2–3 (Cook Cty. Ill. Cir. Ct. Aug. 23, 2019) (dismissing Section 15(a), (b), (c), and (d) claims against ADP and noting Section 15(b)'s "requirement that the private entity whose actions the subsection is meant to regulate must receive a 'written release' … does suggest that the legislature did not intend for the subsection to apply to a third party entity") (attached as **Exhibit F**); *Namuwonge v. Kronos, Inc.*, 418 F. Supp. 3d 279, 286 (N.D. Ill. 2019) (dismissing Section 15(b) claims against third-party timekeeping vendor and noting "there is a difference between *possessing* and *collecting* biometric information").

It would yield absurd results to construe Section 15(b) as imposing individual notice and release obligations on third parties like Microsoft, who do not collect *any* individual's biometric information but simply download a large dataset of anonymized images that, only

MICROSOFT'S MOTION TO DISMISS - 20
(Case No. 2:20-cv-01082-JCC-MAT)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

incidentally, *may* include some images of Illinois residents.  Plaintiffs' proposed solution to this absurdity only compounds the problem.  They allege Microsoft should have identified Plaintiffs' images by clicking the one million "links Defendant Microsoft received from IBM," ascertained each Plaintiff's photographs in the IBM DiF Dataset "originated from, and was affiliated with, his Flickr account," learned of Plaintiffs' Illinois residency by scrutinizing their accounts, and then contacted each Plaintiff to seek an individual release.  Compl. ¶¶ 62-66 (Vance), 70-74 (Janecyk).  Leaving aside the impracticality of this suggestion, it would not even satisfy Section 15(b) as Plaintiffs read it, because the statute forbids an entity's receipt of biometric information unless it "first" provides notice and secures a release.  This, of course, is something the Complaint concedes Microsoft could not have done until *after* it had the IBM DiF dataset in its possession for a sufficient length of time to scour one million Flickr accounts, locate Plaintiffs, identify them as Illinois residents, and secure a release.

In short, under Plaintiffs' reading of the statute, no entity could safely download *any* large biometric dataset, no matter how anonymized the images or laudable the entity's purposes, because the specter of BIPA liability would loom large if the dataset happened to contain any images of Illinois residents—something the entity could ascertain only after it was too late to avoid liability.  "[T]o read BIPA as requiring that a third party ..., without any direct relationship with [plaintiffs], obtain written releases from said [plaintiffs] would be unquestionably not only inconvenient but arguably absurd."  *Bernal*, No. 2017-CH-12364, Ex. G at 2–3.  The Court should dismiss Plaintiffs' BIPA Section 15(b) claim because they do not allege Microsoft actively collected or obtained their biometrics.

### 3. Plaintiffs Fail to Plausibly Allege Microsoft "Profited" From Their Biometrics and Thus Fail to Plead a Section 15(c) Claim.

Plaintiffs' BIPA Section 15(c) claim—based on Microsoft allegedly "profiting" from their biometrics by supposedly using the IBM DiF Database to improve its facial-recognition technology, *see* Compl. ¶ 58—turns on a mischaracterization of "profit" under Section 15(c).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

That section provides an entity may not "sell, lease, trade, or otherwise profit from a person's ... biometric identifier or biometric information." The four verbs—"sell, lease, trade, or otherwise profit"—all contemplate the direct provision of biometric data in exchange for money. 740 ILCS 14/15(c). "[W]hen a statutory clause specifically describes several classes of ... things and then includes 'other ... things,' the word 'other' is interpreted to mean 'other such like.'" *Pooh-Bah Enter., Inc. v. Cnty. of Cook,* 905 N.E.2d 781, 799 (Ill. 2009). Thus, like "sell," "lease," and "trade," Section 15(c)'s use of "otherwise profit" contemplates an entity receiving a pecuniary benefit in exchange for a person's biometric data—not the indirect "profit" gained by using a large dataset of information derived from anonymous facial imagery "to improve the fairness and accuracy of ... facial recognition." Compl. ¶ 57.

Nothing in the Complaint plausibly suggests Microsoft profited from Plaintiffs' biometric data. For that reason, the Court should dismiss Plaintiffs' Section 15(c) claim.

## II.   THE COURT SHOULD DISMISS THE UNJUST ENRICHMENT CLAIM.

Plaintiffs must plead three elements to allege unjust enrichment under Washington law: "(1) that Microsoft received a benefit, (2) at [Plaintiffs'] expense, and (3) the circumstances make it unjust for Microsoft to retain the benefit without payment." *Cousineau v. Microsoft Corp*., 992 F. Supp. 2d 1116, 1129 (W.D. Wash. 2012) (Coughenour, J.) (citing *Young v. Young*, 164 Wn.2d 477 (2008)). Illinois law is no different. S*ee Cleary v. Philip Morris Inc*., 656 F.3d 511, 516 (7th Cir. 2011) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc*., 545 N.E.2d 672, 679 (Ill. 1989)) ("In Illinois, '[t]o state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'"). "In the absence of a conflict [between Illinois and Washington law], Washington law applies" because it is the law of the forum state. *Kelley v. Microsoft Corp.*, 251 F.R.D. 544, 550 (W.D. Wash. 2008).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1    The Court should dismiss Plaintiffs' unjust enrichment claim for at least three reasons.

2    *First*, as explained above, the conduct at issue does not violate any applicable law, and

3    Plaintiffs have not alleged anything independent of BIPA that would make Microsoft's

4    alleged conduct "inequitable."  In fact, nothing in the Complaint suggests Plaintiffs' Flickr

5    photos were privately posted; to the contrary, Plaintiffs suggest their images were publicly

6    available to anyone.  *See* Compl. ¶¶ 64, 72.

7    *Second*, although Plaintiffs allege the IBM DiF Dataset, consisting of a million

8    images, indirectly "enriched" Microsoft by playing some undefined role in "improv[ing] its

9    facial recognition products," Compl. ¶ 58, they do not allege this purported enrichment caused

10   them to suffer a corresponding economic "expense" or "detriment."  This Court has rejected

11   the notion that unjust enrichment can be based on alleged misuse of personal or private data

12   because unjust enrichment does not apply "outside the context of an 'expense' stemming from

13   some tangible economic loss to a plaintiff."  *Cousineau*, 992 F. Supp. 2d at 1129-30 (granting

14   motion to dismiss unjust enrichment claim that Microsoft used location data "to improve its

15   systems and develop its mobile marketing campaign"); *see also Mount v. PulsePoint, Inc.*,

16   684 Fed. App'x 32, 36 (2d Cir. 2017), *as amended* (May 3, 2017) (plaintiffs failed to plead

17   unjust enrichment in light of "plaintiffs' failure to allege specific loss or deprivation of

18   opportunity to profit from [personal] information"); *Welborn v. Internal Revenue Serv.*, 218 F.

19   Supp. 3d 64, 78 (D.D.C. 2016) (collecting cases for observation "[c]ourts have routinely

20   rejected the proposition that an individual's personal identifying information has an

21   independent monetary value").

22   *Third*, unjust enrichment provides an equitable remedy, available only when a plaintiff

23   lacks an adequate remedy at law.  As a result, when plaintiffs have a statutory remedy

24   available, "they are not entitled to pursue a remedy in equity" for unjust enrichment.  *Seattle*

25   *Prof'l Eng'g Employees Ass'n v. Boeing Co.*, 139 Wn.2d 824, 838–39 (2000) (employees who

26   "had a cause of action under chapter 49.52 RCW" could not pursue equitable claim for

MICROSOFT'S MOTION TO DISMISS - 23
(Case No. 2:20-cv-01082-JCC-MAT)

1  restitution or unjust enrichment).  Here, no common law principle makes it unfair or

2  inequitable for an entity "to improve the fairness and accuracy of its facial recognition

3  products and technologies," Compl. ¶ 57, by using biometric markers derived from a large

4  dataset of photographs.  Plaintiffs' unjust enrichment claim therefore turns on their allegation

5  of a BIPA violation.  In the circumstances, Plaintiffs must pursue their remedies at law, under

6  BIPA, or not at all.

7  **III.    PLAINTIFFS HAVE NO SEPARATE INJUNCTIVE RELIEF CLAIM.**

8      Plaintiffs' purported cause of action for injunctive relief fails because "[i]njunctive

9  relief is a remedy, not a cause of action."  *Edifecs Inc., v. TIBCO Software Inc.*, 2011 WL

10  1045645, at *3 (W.D. Wash. Mar. 23, 2011).  The Court should also dismiss the request for

11  injunctive relief because Plaintiffs fail to plead viable causes of action in Counts I through III

12  and, therefore, have no valid claim to which they could tie the requested remedy of injunctive

13  relief.  *See, e.g.*, *Edwards v. JPMorgan Chase Bank, N.A.*, 2011 WL 3516155, at *3–4 (W.D.

14  Wash. Aug. 11, 2011) (dismissing injunctive relief claim and noting plaintiffs "have no right

15  to injunctive relief absence a viable cause of action against [defendant]").

16                                      **CONCLUSION**

17      For the foregoing reasons, Microsoft respectfully requests that the Court dismiss

18  Plaintiffs' Complaint with prejudice.

19      DATED this 14th day of September, 2020.

20

21                              DAVIS WRIGHT TREMAINE LLP
                                Attorneys for Defendant Microsoft
22                              Corporation

23                              By */s/ Stephen M. Rummage*
                                   Stephen M. Rummage, WSBA #11168
24                                 Xiang Li, WSBA #52306
                                   920 Fifth Avenue, Suite 3300
25                                 Seattle, WA  98104-1610
                                   Telephone: (206) 757-8136
26                                 Fax: (206) 757-7136
                                   E-mail: steverummage@dwt.com
                                           xiangli@dwt.com

MICROSOFT'S MOTION TO DISMISS - 24
(Case No. 2:20-cv-01082-JCC-MAT)

MORGAN LEWIS & BOCKIUS
Attorneys for Defendant Microsoft
Corporation

By /s/ Elizabeth B. Herrington
    Elizabeth B. Herrington (*pro hac vice*)
    Tyler Zmick (*pro hac vice*)
    77 West Wacker Drive, Suite 500
    Chicago, IL 60601-5094
    Telephone: (312) 324-1188
    E-mail:
    beth.herrington@morganlewis.com
    tyler.zmick@morganlewis.com

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

# Exhibit A

**SB2400**



# 95TH GENERAL ASSEMBLY

## State of Illinois

## 2007 and 2008

### SB2400

Introduced 2/14/2008, by Sen. Terry Link

## SYNOPSIS AS INTRODUCED:

New Act

    Creates the Biometric Information Privacy Act. Provides that a public
agency or private entity in possession of biometric identifiers or
biometric information must develop a written policy, made available to the
public, establishing a retention schedule and guidelines for permanently
destroying biometric identifiers and biometric information when the
initial purpose for collecting or obtaining such identifiers or information
has been satisfied or within 3 years of the individual's last interaction
with the public agency or private entity. Provides that absent a valid
warrant or subpoena, a public agency or private entity in possession of
biometric identifiers or biometric information must comply with its
established retention schedule and destruction guidelines. Provides that
no public agency or private entity may collect, capture, purchase, receive
through trade, or otherwise obtain a person's or a customer's biometric
identifier or biometric information, unless it first satisfies certain
conditions. Provides that these provisions do not apply to a public agency
engaged in criminal investigations or prosecutions or a public agency
acting pursuant to a valid warrant or subpoena. Provides that a public
agency in possession of biometric identifiers or biometric information
shall store, transmit, and protect from disclosure all biometric
identifiers and biometric information in a manner that is the same as or
more protective than the manner in which the public agency stores,
transmits, and protects other confidential and sensitive information.
Provides that any person aggrieved by a violation of this Act shall have a
right of action in a State circuit court or as a supplemental claim in
federal district court. Preempts home rule. Contains other provisions.

                                        LRB095 19768 KBJ 46142 b


         FISCAL NOTE ACT                        HOME RULE NOTE
          MAY APPLY                             ACT MAY APPLY




                        A BILL FOR

SB2400                                         LRB095 19768 KBJ 46142 b

1        AN ACT concerning health.

2        **Be it enacted by the People of the State of Illinois,**

3        **represented in the General Assembly:**

4        Section 1. Short title. This Act may be cited as the

5    Biometric Information Privacy Act.

6        Section 5. Legislative findings; intent. The General

7    Assembly finds all of the following:

8        (a) The use of biometrics is growing in the business and

9    security screening sectors and appears to promise streamlined

10   financial transactions and security screenings.

11       (b) Major national corporations have selected the City of

12   Chicago and other locations in this State as pilot testing

13   sites for new applications of biometric-facilitated financial

14   transactions, including "Pay By Touch" at banks, grocery

15   stores, gas stations, and school cafeterias.

16       (c) Biometrics are unlike other unique identifiers that are

17   used to access finances or other sensitive information. For

18   example, social security numbers, when compromised, can be

19   changed. Biometrics, however, are biologically unique to the

20   individual; therefore, once compromised, the individual has no

21   recourse, is at heightened risk for identity theft, and is

22   likely to withdraw from biometric-facilitated transactions.

23       (d) An overwhelming majority of members of the public are

SB2400                          - 2 -          LRB095 19768 KBJ 46142 b

1    opposed to the use of biometrics when such information is tied

2    to personal finances and other personal information.

3        (e) Despite limited State law regulating the collection,

4    use, safeguarding, and storage of biometric information, many

5    members of the public are deterred from partaking in biometric

6    identifier-facilitated facility transactions.

7        (f) The public welfare, security, and safety will be served

8    by regulating the collection, use, safeguarding, handling,

9    storage, retention, and destruction of biometric identifiers

10   and information.

11       Section 10. Definitions. In this Act:

12       "Biometric identifier" means any indelible personal

13   physical characteristic which can be used to uniquely identify

14   an individual or pinpoint an individual at a particular place

15   at a particular time. Examples of biometric identifiers

16   include, but are not limited to iris or retinal scans,

17   fingerprints, voiceprints, and records of hand or facial

18   geometry. Biometric identifiers do not include writing

19   samples, written signature, and photographs.

20       "Biometric information" means any information, regardless

21   of how it is captured, converted, stored, or shared, based on

22   an individual's biometric identifier used to identify an

23   individual.

24       "Confidential and sensitive information" means personal

25   information that can be used to uniquely identify an individual

1    or an individual's account or property include, but are not
2    limited to a genetic marker, genetic testing information, a
3    unique identifier number to locate an account or property, an
4    account number, a PIN number, a pass code, a driver's license
5    number, or a social security number.
6        "Legally effective written release" means informed written
7    consent.
8        "Private   entity"   means   any   individual,   partnership,
9    corporation, limited liability company, association, or other
10   group, however organized.
11       "Public agency" means the State of Illinois and its various
12   subdivisions and agencies, and all units of local government,
13   school districts, and other governmental entities.

14       Section   15.   Retention;   collection;   disclosure;
15   destruction.
16       (a) A public agency or private entity in possession of
17   biometric identifiers or biometric information must develop a
18   written policy, made available to the public, establishing a
19   retention schedule and guidelines for permanently destroying
20   biometric identifiers and biometric information when the
21   initial purpose for collecting or obtaining such identifiers or
22   information has been satisfied or within 3 years of the
23   individual's last interaction with the public agency or private
24   entity. Absent a valid warrant or subpoena issued by a court of
25   competent jurisdiction, a public agency or private entity in

SB2400                          - 4 -          LRB095 19768 KBJ 46142 b

1   possession of biometric identifiers or biometric information

2   must comply with its established retention schedule and

3   destruction guidelines.

4       (b)  No public agency or private entity may collect,

5   capture, purchase, receive through trade, or otherwise obtain a

6   person's or a customer's biometric identifier or biometric

7   information, unless it first:

8           (1) informs the subject in writing that a biometric

9       identifier or biometric information is being collected or

10      stored;

11          (2) informs the subject in writing of the specific

12      purpose and length of term for which a biometric identifier

13      or biometric information is being collected, stored, and

14      used; and

15          (3) receives a legally effective written release

16      executed by the subject of the biometric identifier or

17      biometric information or the subject's legally authorized

18      representative.

19      (c) Subsections (a) and (b) of this Section do not apply to

20  a public agency engaged in criminal investigations or

21  prosecutions. Subsections (a) and (b) of this Section do not

22  apply to a public agency acting pursuant to a valid warrant or

23  subpoena issued by a court of competent jurisdiction.

24      (d) No public agency or private entity in possession of a

25  biometric identifier or biometric information may sell, lease,

26  trade, or otherwise profit from a person's or a customer's

SB2400                        - 5 -        LRB095 19768 KBJ 46142 b

1    biometric identifier or biometric information.

2        (e)  Nothing in subsection (d) of this Section shall be

3    construed to prohibit or inhibit a public agency engaged in

4    criminal investigations or prosecutions from:

5            (1)  sharing  biometric  identifiers  or  biometric

6        information with another public agency engaged in criminal

7        investigations  or  prosecutions  to  further  such  criminal

8        investigations or prosecutions;

9            (2)  sharing  biometric  identifiers  or  biometric

10       information pursuant to federal law or regulation; or

11           (3)  sharing  biometric  identifiers  or  biometric

12       information pursuant to a valid warrant or subpoena issued

13       by a court of competent jurisdiction.

14       (f)  No  public  agency,  private  entity,  or  person  in

15   possession of a biometric identifier or biometric information

16   may disclose, redisclose, or otherwise disseminate a person's

17   or a customer's biometric identifier or biometric information,

18   unless:

19           (1)  the  subject  of  the  biometric  identifier  or

20       biometric information or the subject's legally authorized

21       representative consents to the disclosure or redisclosure;

22           (2)  the  disclosure  or  redisclosure  completes  a

23       financial  transaction  requested  or  authorized  by  the

24       subject  of  the  biometric  identifier  or  the  biometric

25       information;

26           (3) the disclosure or redisclosure is required under

1    federal law; and

2        (4) the disclosure is required pursuant to a valid

3    warrant or subpoena issued by a court of competent

4    jurisdiction.

5    (g) A public agency in possession of biometric identifiers

6    or biometric information shall store, transmit, and protect

7    from disclosure all biometric identifiers and biometric

8    information in a manner that is the same as or more protective

9    than the manner in which the public agency stores, transmits,

10   and protects other confidential and sensitive information.

11   (h) A private entity in possession of a biometric

12   identifier or biometric information shall:

13       (1) store, transmit, and protect from disclosure all

14       biometric identifiers and biometric information using the

15       reasonable standard of care within the private entity's

16       industry; and

17       (2) store, transmit, and protect from disclosure all

18       biometric identifiers and biometric information in a

19       manner that is the same as or more protective than the

20       manner in which the private entity stores, transmits, and

21       protects other confidential and sensitive information.

22   (i) All information and records held by a public agency

23   pertaining to biometric identifiers and biometric information

24   shall be confidential and exempt from copying and inspection

25   under the Freedom of Information Act to all except to the

26   subject of the biometric identifier or biometric information.

1    The   subject   of   the   biometric   identifier   or   biometric

2    information held by a public agency shall be permitted to copy

3    and inspect only their own biometric identifiers and biometric

4    information.

5        Section 20. Right of action.

6        (a)  Any person aggrieved by a violation of this Act shall

7    have  a  right  of  action  in  a  State  circuit  court  or  as  a

8    supplemental  claim  in  federal  district  court  against  an

9    offending  party.  A  prevailing  party  may  recover  for  each

10   violation:

11       (1) against any public agency or private entity that

12       negligently violates a provision of this Act, liquidated

13       damages of $1,000 or actual damages, whichever is greater;

14       (2) against any public agency or private entity that

15       intentionally or recklessly violates a provision of this

16       Act,  liquidated  damages  of  $5,000  or  actual  damages,

17       whichever is greater;

18       (3)  reasonable  attorneys'  fees  and  costs,  including

19       expert witness fees and other litigation expenses; and

20       (4) other relief, including an injunction, as the State

21       or federal court may deem appropriate.

22   (b)  For  the  purpose  of  this  Act,  "prevailing  party"

23   includes  any  party:  (i)  who  obtains  some  of  his  or  her

24   requested  relief  through  a  judicial  judgment  in  his  or  her

25   favor;  (ii)  who  obtains  some  of  his  or  her  requested  relief

1    through any settlement agreement approved by the court; or

2    (iii) whose pursuit of a non-frivolous claim was a catalyst for

3    a unilateral change in position by the opposing party relative

4    to the relief sought.


5        Section 25. Home rule. The corporate authorities of a

6    municipality or other unit of local government may enact

7    ordinances, standards, rules, or regulations that protect

8    biometric identifiers and biometric information in a manner or

9    to an extent equal to or greater than the protection provided

10   in this Act. This Section is a limitation on the concurrent

11   exercise of home rule power under subsection (i) of Section 6

12   of Article VII of the Illinois Constitution.

# Exhibit B

**Sen. Terry Link**

# Filed: 4/11/2008

09500SB2400sam004                    LRB095 19768 RPM 49426 a

1           AMENDMENT TO SENATE BILL 2400

2       AMENDMENT NO. _____. Amend Senate Bill 2400, AS AMENDED,
3    by replacing everything after the enacting clause with the
4    following:

5       "Section 1. Short title. This Act may be cited as the
6    Biometric Information Privacy Act.

7       Section 5. Legislative findings; intent. The General
8    Assembly finds all of the following:

9       (a) The use of biometrics is growing in the business and
10   security screening sectors and appears to promise streamlined
11   financial transactions and security screenings.

12      (b) Major national corporations have selected the City of
13   Chicago and other locations in this State as pilot testing
14   sites for new applications of biometric-facilitated financial
15   transactions, including "Pay By Touch" at banks, grocery
16   stores, gas stations, and school cafeterias.

09500SB2400sam004            -2-        LRB095 19768 RPM 49426 a

1      (c) Biometrics are unlike other unique identifiers that are
2  used to access finances or other sensitive information. For
3  example, social security numbers, when compromised, can be
4  changed. Biometrics, however, are biologically unique to the
5  individual; therefore, once compromised, the individual has no
6  recourse, is at heightened risk for identity theft, and is
7  likely to withdraw from biometric-facilitated transactions.

8      (d) An overwhelming majority of members of the public are
9  opposed to the use of biometrics when such information is tied
10 to personal finances and other personal information.

11     (e) Despite limited State law regulating the collection,
12 use, safeguarding, and storage of biometric information, many
13 members of the public are deterred from partaking in biometric
14 identifier-facilitated facility transactions.

15     (f) The public welfare, security, and safety will be served
16 by regulating the collection, use, safeguarding, handling,
17 storage, retention, and destruction of biometric identifiers
18 and information.

19     Section 10. Definitions. In this Act:
20     "Biometric identifier" means any indelible personal
21 physical characteristic which can be used to uniquely identify
22 an individual or pinpoint an individual at a particular place
23 at a particular time. Examples of biometric identifiers
24 include, but are not limited to iris or retinal scans,
25 fingerprints, voiceprints, and records or scans of hand

09500SB2400sam004                -3-        LRB095 19768 RPM 49426 a

1   geometry, facial geometry, or facial recognition. Biometric

2   identifiers do not include writing samples, written

3   signatures, photographs, tattoo descriptions, physical

4   descriptions, or human biological samples used for valid

5   scientific testing or screening. Biometric identifiers do not

6   include donated organs, tissues, or parts as defined in the

7   Illinois Anatomical Gift Act or blood or serum stored on behalf

8   of recipients or potential recipients of living or cadaveric

9   transplants and obtained or stored by a federally-designated

10  organ procurement agency. Biometric identifiers do not include

11  biological materials regulated under the Genetic Information

12  Privacy Act. Biometric identifiers do not include information

13  captured from a patient in a health care setting or information

14  collected, used, or stored for health care treatment, payment,

15  or operations under the federal Health Insurance Portability

16  and Accountability Act of 1996. Biometric identifiers do not

17  include an X-ray, roentgen process, computed tomography, MRI,

18  PET scan, mammography, or other image or film of the human

19  anatomy used to diagnose, prognose, or treat an illness or

20  other medical condition or to further valid scientific testing

21  or screening.

22      "Biometric information" means any information, regardless

23  of how it is captured, converted, stored, or shared, based on

24  an individual's biometric identifier used to identify an

25  individual. Biometric information does not include information

26  derived from items or procedures excluded under the definition

09500SB2400sam004            -4-        LRB095 19768 RPM 49426 a

1    of biometric identifiers. Biometric information does not
2    include information captured from a patient in a health care
3    setting or information collected, used, or stored for health
4    care treatment, payment, or operations under the federal Health
5    Insurance Portability and Accountability Act of 1996.
6        "Confidential and sensitive information" means personal
7    information that can be used to uniquely identify an individual
8    or an individual's account or property. Examples of
9    confidential and sensitive information include, but are not
10   limited to, a genetic marker, genetic testing information, a
11   unique identifier number to locate an account or property, an
12   account number, a PIN number, a pass code, a driver's license
13   number, or a social security number.
14       "Legally effective written release" means informed written
15   consent or a release executed by an employee as a condition of
16   employment.
17       "Private entity" means any individual, partnership,
18   corporation, limited liability company, association, or other
19   group, however organized. A private entity does not include a
20   public agency. A private entity does not include any court of
21   Illinois, a clerk of the court, or a judge or justice thereof.
22       "Public agency" means the State of Illinois and its various
23   subdivisions and agencies, and all units of local government,
24   school districts, and other governmental entities. A public
25   agency does not include any court of Illinois, a clerk of the
26   court, or a judge or justice thereof.

09500SB2400sam004            -5-        LRB095 19768 RPM 49426 a

1     Section   15.   Retention;   collection;   disclosure;
2 destruction.

3     (a) A public agency or private entity in possession of
4 biometric identifiers or biometric information must develop a
5 written policy, made available to the public, establishing a
6 retention schedule and guidelines for permanently destroying
7 biometric   identifiers   and   biometric   information   when   the
8 initial purpose for collecting or obtaining such identifiers or
9 information has been satisfied or within 3 years of the
10 individual's last interaction with the public agency or private
11 entity, whichever occurs first. Absent a valid warrant or
12 subpoena issued by a court of competent jurisdiction, a public
13 agency or private entity in possession of biometric identifiers
14 or biometric information must comply with its established
15 retention schedule and destruction guidelines.

16     (b) No public agency or private entity may collect,
17 capture, purchase, receive through trade, or otherwise obtain a
18 person's or a customer's biometric identifier or biometric
19 information, unless it first:

20         (1) informs the subject in writing that a biometric
21     identifier or biometric information is being collected or
22     stored;

23         (2) informs the subject in writing of the specific
24     purpose and length of term for which a biometric identifier
25     or biometric information is being collected, stored, and

09500SB2400sam004                -6-          LRB095 19768 RPM 49426 a

1       used; and

2           (3)  receives  a  legally  effective  written  release

3       executed  by  the  subject  of  the  biometric  identifier  or

4       biometric  information  or  the  subject's  legally  authorized

5       representative.

6       (c) Subsections (a) and (b) of this Section do not apply to

7   a public agency:

8           (1)  engaged  in  criminal  investigations,  arrests,

9       prosecutions, or law enforcement;

10          (2)  overseeing  pretrial  detention,  post-trial

11      commitment,  corrections  or  incarceration,  civil

12      commitment, probation services, or parole services;

13          (3)  serving  as  the  State  central  repository  of

14      biometrics  for  criminal  identification  and  investigation

15      purposes;

16          (4)  furnishing  biometric  identifiers  or  biometric

17      information to a State or federal repository of biometrics

18      pursuant to State or federal law or municipal ordinance;

19          (5)  receiving  biometric  identifiers  or  biometric

20      information pursuant to State or federal law or municipal

21      ordinance;

22          (6)  acting  pursuant  to  a  valid  warrant  or  subpoena

23      issued by a court of competent jurisdiction;

24          (7)  issuing  driver's  licenses,  driver's  permits,

25      identification  cards  issued  pursuant  to  the  Illinois

26      Identification Card Act, or occupational licenses; or

1     (8) performing employee background checks in

2     accordance with the public agency's hiring policies or

3     statutory obligations.

4     Nothing in subsections (a) and (b) of this Section shall be

5     construed to conflict with the retention and collection

6     practices for fingerprints, other biometric identifiers, or

7     biometric information under the Criminal Identification Act,

8     the Illinois Uniform Conviction Information Act, or the federal

9     National Crime Prevention and Privacy Compact. Subsection (a)

10     of this Section does not apply to school districts; however, a

11     school district that collects biometric identifiers or

12     biometric information must adopt retention schedules and

13     destruction policies in accordance with the School Code.

14     Subsection (a) of this Section does not apply to a fingerprint

15     vendor or fingerprint vendor agency; however, a fingerprint

16     vendor or fingerprint vendor agency must adopt retention

17     schedules and destruction polices in accordance with the

18     Private Detective, Private Alarm, Private Security,

19     Fingerprint Vendor, and Locksmith Act of 2004.

20     (d) No public agency or private entity in possession of a

21     biometric identifier or biometric information may sell, lease,

22     trade, or otherwise profit from a person's or a customer's

23     biometric identifier or biometric information.

24     (e) No public agency or private entity in possession of a

25     biometric identifier or biometric information may disclose,

26     redisclose, or otherwise disseminate a person's or a customer's

09500SB2400sam004            -8-         LRB095 19768 RPM 49426 a

1   biometric identifier or biometric information unless:

2         (1)  the  subject  of  the  biometric  identifier  or

3         biometric information or the subject's legally-authorized

4         representative consents to the disclosure or redisclosure;

5         (2)  the  disclosure  or  redisclosure  completes  a

6         financial  transaction  requested  or  authorized  by  the

7         subject  of  the  biometric  identifier  or  the  biometric

8         information;

9         (3) the disclosure or redisclosure is required by State

10        or federal law or municipal ordinance; or

11        (4)  the  disclosure  is  required  pursuant  to  a  valid

12        warrant  or  subpoena  issued  by  a  court  of  competent

13        jurisdiction.

14   (f) Nothing in subsections (d) or (e) of this Section shall

15   be construed to prohibit or inhibit a public agency (i) engaged

16   in  criminal  investigations,  arrests,  prosecutions,  or  law

17   enforcement, (ii) overseeing pretrial detention, post-trial

18   commitment,  corrections  or  incarceration,  civil  commitment,

19   probation services, or parole services, (iii) serving as the

20   State  central  repository  of  biometrics  for  criminal

21   identification  and  investigation  purposes,  (iv)  furnishing

22   biometric  identifiers  or  biometric  information  to  a  State  or

23   federal repository of biometrics pursuant to State or federal

24   law, or (v) issuing driver's licenses, driver's permits, or

25   identification  cards  pursuant  to  the  Illinois  Identification

26   Card Act from:

09500SB2400sam004            -9-         LRB095 19768 RPM 49426 a

1    (1)  sharing  biometric  identifiers  or  biometric

2   information with another public agency engaged in criminal

3   investigations, arrests, prosecutions, or law enforcement

4   to  further  such  criminal  investigations,  arrests,

5   prosecutions, or law enforcement;

6    (2)  sharing  biometric  identifiers  or  biometric  or

7   biometric  information  with  another  public  agency

8   overseeing  pretrial  detention,  post-trial  commitment,

9   corrections  or  incarceration,  civil  commitment,  probation

10   services, or parole services;

11    (3)  sharing  biometric  identifiers  or  biometric

12   information pursuant to, or required by, State or federal

13   law; or

14    (4)  sharing  biometric  identifiers  or  biometric

15   information pursuant to a valid warrant or subpoena issued

16   by a court of competent jurisdiction.

17  (g) Nothing in subsections (d) or (e) of this Section shall

18 be  construed  to  conflict  with  the  reporting  and  sharing

19 practices  for  fingerprints,  other  biometric  identifiers,  or

20 biometric  information  under  the  Criminal  Identification  Act,

21 the  Illinois  Uniform  Conviction  Information  Act,  and  the

22 federal National Crime Prevention and Privacy Compact. Nothing

23 in  subsection  (d)  of  this  Section  shall  be  construed  to

24 conflict  with  the  reporting  and  sharing  practices  of  a

25 fingerprint  vendor  or  fingerprint  vendor  agency  under  the

26 Private   Detective,   Private   Alarm,   Private   Security,

09500SB2400sam004              -10-        LRB095 19768 RPM 49426 a

1    Fingerprint Vendor, and Locksmith Act of 2004.

2        (h) Nothing in subsections (d) or (e) of this Section shall

3    be construed to prohibit or inhibit a public agency that issues

4    occupational licenses from:

5            (1)  sharing  biometric  identifiers  or  biometric

6        information  pursuant  to  or  when  required  by  State  or

7        federal law; or

8            (2)  sharing  biometric  identifiers  or  biometric

9        information pursuant to a valid warrant or subpoena issued

10       by a court of competent jurisdiction.

11       (i) Nothing in subsections (d) or (e) of this Section shall

12   be  construed  to  prohibit  a  public  agency  from  performing

13   employee  background  checks  in  accordance  with  the  public

14   agency's hiring policies or statutory obligations.

15       (j) A public agency in possession of biometric identifiers

16   or  biometric  information  shall  store,  transmit,  and  protect

17   from  disclosure  all  biometric  identifiers  and  biometric

18   information in a reasonable manner that is the same as or more

19   protective than the manner in which the public agency stores,

20   transmits,  and  protects  other  similar  confidential  and

21   sensitive  information  specific  to  that  public  agency.  The

22   storage, transmittal, and protection from disclosure standards

23   under this subsection (j) are solely the choice of the public

24   agency to adopt in accordance with this Act, other applicable

25   State or federal law, evolving advances in technology, budget

26   constraints, and comparable practices specific to that public

1    agency.

2        (k)  A  private  entity  in  possession  of  a  biometric

3    identifier or biometric information shall:

4            (1) store, transmit, and protect from disclosure all

5        biometric identifiers and biometric information using the

6        reasonable  standard  of  care  within  the  private  entity's

7        industry; and

8            (2) store, transmit, and protect from disclosure all

9        biometric  identifiers  and  biometric  information  in  a

10       manner that is the same as or more protective than the

11       manner in which the private entity stores, transmits, and

12       protects other confidential and sensitive information.

13       (l) All information and records held by a public agency

14   pertaining to biometric identifiers and biometric information

15   shall be confidential and exempt from copying and inspection

16   under  the  Freedom  of  Information  Act  to  all  except  to  the

17   subject of the biometric identifier or biometric information.

18   The  subject  of  the  biometric  identifier  or  biometric

19   information held by a public agency shall be permitted to copy

20   and inspect only their own biometric identifiers and biometric

21   information.

22       Section 20. Right of action. Any person aggrieved by a

23   violation of this Act shall have a right of action in a State

24   circuit court or as a supplemental claim in federal district

25   court  against  an  offending  party.  A  prevailing  party  may

09500SB2400sam004            -12-        LRB095 19768 RPM 49426 a

1    recover for each violation:

2        (1) against any public agency or private entity that

3        negligently violates a provision of this Act, liquidated

4        damages of $1,000 or actual damages, whichever is greater;

5        (2) against any public agency or private entity that

6        intentionally or recklessly violates a provision of this

7        Act, liquidated damages of $5,000 or actual damages,

8        whichever is greater;

9        (3) reasonable attorneys' fees and costs, including

10       expert witness fees and other litigation expenses; and

11       (4) other relief, including an injunction, as the State

12       or federal court may deem appropriate.

13   Section 25. Construction. Nothing in this Act shall be

14   construed to impact the admission or discovery of biometric

15   identifiers and biometric information in any action of any kind

16   in any court, or before any tribunal, board, agency, or person.

17   Nothing in this Act shall be construed to conflict with the

18   X-Ray Retention Act or the federal Health Insurance Portability

19   and Accountability Act of 1996. Subcontractors or agents of a

20   public agency must comply with this Act to the extent and

21   manner this Act applies to that public agency.

22   Section 30. Home rule. Any home rule unit of local

23   government, any non home rule municipality, or any non home

24   rule county within the unincorporated territory of the county

09500SB2400sam004                -13-        LRB095 19768 RPM 49426 a

1    may enact ordinances, standards, rules, or regulations that
2    protect biometric identifiers and biometric information in a
3    manner or to an extent equal to or greater than the protection
4    provided in this Act. This Section is a limitation on the
5    concurrent exercise of home rule power under subsection (i) of
6    Section 6 of Article VII of the Illinois Constitution.

7        Section 95. Applicability. This Act applies to private
8    entities beginning on the effective date of this Act. This Act
9    applies to public agencies beginning on January 1, 2011.

10        Section 99. Effective date. This Act takes effect upon
11    becoming law.".

# Exhibit C

**Executive Committee**

# Filed: 5/28/2008

09500SB2400ham001                    LRB095 19768 RPM 51505 a

1                AMENDMENT TO SENATE BILL 2400

2        AMENDMENT NO. _____. Amend Senate Bill 2400 by replacing

3    everything after the enacting clause with the following:

4        "Section 1. Short title. This Act may be cited as the

5    Biometric Information Privacy Act.

6        Section 5. Legislative findings; intent. The General

7    Assembly finds all of the following:

8        (a) The use of biometrics is growing in the business and

9    security screening sectors and appears to promise streamlined

10   financial transactions and security screenings.

11       (b) Major national corporations have selected the City of

12   Chicago and other locations in this State as pilot testing

13   sites for new applications of biometric-facilitated financial

14   transactions, including finger-scan technologies at grocery

15   stores, gas stations, and school cafeterias.

16       (c) Biometrics are unlike other unique identifiers that are

09500SB2400ham001            -2-        LRB095 19768 RPM 51505 a

1    used to access finances or other sensitive information. For
2    example, social security numbers, when compromised, can be
3    changed. Biometrics, however, are biologically unique to the
4    individual; therefore, once compromised, the individual has no
5    recourse, is at heightened risk for identity theft, and is
6    likely to withdraw from biometric-facilitated transactions.

7        (d) An overwhelming majority of members of the public are
8    weary of the use of biometrics when such information is tied to
9    finances and other personal information.

10       (e) Despite limited State law regulating the collection,
11   use, safeguarding, and storage of biometrics, many members of
12   the public are deterred from partaking in biometric
13   identifier-facilitated transactions.

14       (f) The full ramifications of biometric technology are not
15   fully known.

16       (g) The public welfare, security, and safety will be served
17   by regulating the collection, use, safeguarding, handling,
18   storage, retention, and destruction of biometric identifiers
19   and information.

20       Section 10. Definitions. In this Act:
21       "Biometric identifier" means a retina or iris scan,
22   fingerprint, voiceprint, or scan of hand or face geometry.
23   Biometric identifiers do not include writing samples, written
24   signatures, photographs, human biological samples used for
25   valid scientific testing or screening, demographic data,

09500SB2400ham001                -3-        LRB095 19768 RPM 51505 a

1     tattoo descriptions, or physical descriptions such as height,
2     weight, hair color, or eye color. Biometric identifiers do not
3     include donated organs, tissues, or parts as defined in the
4     Illinois Anatomical Gift Act or blood or serum stored on behalf
5     of recipients or potential recipients of living or cadaveric
6     transplants and obtained or stored by a federally designated
7     organ procurement agency. Biometric identifiers do not include
8     biological materials regulated under the Genetic Information
9     Privacy Act. Biometric identifiers do not include information
10    captured from a patient in a health care setting or information
11    collected, used, or stored for health care treatment, payment,
12    or operations under the federal Health Insurance Portability
13    and Accountability Act of 1996. Biometric identifiers do not
14    include an X-ray, roentgen process, computed tomography, MRI,
15    PET scan, mammography, or other image or film of the human
16    anatomy used to diagnose, prognose, or treat an illness or
17    other medical condition or to further validate scientific
18    testing or screening.
19        "Biometric information" means any information, regardless
20    of how it is captured, converted, stored, or shared, based on
21    an individual's biometric identifier used to identify an
22    individual. Biometric information does not include information
23    derived from items or procedures excluded under the definition
24    of biometric identifiers.
25        "Confidential and sensitive information" means personal
26    information that can be used to uniquely identify an individual

1    or an individual's account or property. Examples of
2    confidential and sensitive information include, but are not
3    limited to, a genetic marker, genetic testing information, a
4    unique identifier number to locate an account or property, an
5    account number, a PIN number, a pass code, a driver's license
6    number, or a social security number.

7        "Private entity" means any individual, partnership,
8    corporation, limited liability company, association, or other
9    group, however organized. A private entity does not include a
10   State or local government agency. A private entity does not
11   include any court of Illinois, a clerk of the court, or a judge
12   or justice thereof.

13       "Written release" means informed written consent or, in the
14   context of employment, a release executed by an employee as a
15   condition of employment.


16       Section 15. Retention; collection; disclosure;
17   destruction.

18       (a) A private entity in possession of biometric identifiers
19   or biometric information must develop a written policy, made
20   available to the public, establishing a retention schedule and
21   guidelines for permanently destroying biometric identifiers
22   and biometric information when the initial purpose for
23   collecting or obtaining such identifiers or information has
24   been satisfied or within 3 years of the individual's last
25   interaction with the private entity, whichever occurs first.

09500SB2400ham001             -5-        LRB095 19768 RPM 51505 a

1    Absent  a  valid  warrant  or  subpoena  issued  by  a  court  of
2    competent  jurisdiction,  a  private  entity  in  possession  of
3    biometric  identifiers  or  biometric  information  must  comply
4    with  its  established  retention  schedule  and  destruction
5    guidelines.
6        (b)  No  private  entity  may  collect,  capture,  purchase,
7    receive  through  trade,  or  otherwise  obtain  a  person's  or  a
8    customer's  biometric  identifier  or  biometric  information,
9    unless  it  first:
10           (1)  informs  the  subject  or  the  subject's  legally
11       authorized  representative  in  writing  that  a  biometric
12       identifier  or  biometric  information  is  being  collected  or
13       stored;
14           (2)  informs  the  subject  or  the  subject's  legally
15       authorized  representative  in  writing  of  the  specific
16       purpose  and  length  of  term  for  which  a  biometric  identifier
17       or  biometric  information  is  being  collected,  stored,  and
18       used;  and
19           (3)  receives  a  written  release  executed  by  the  subject
20       of  the  biometric  identifier  or  biometric  information  or  the
21       subject's  legally  authorized  representative.
22       (c)  No  private  entity  in  possession  of  a  biometric
23    identifier  or  biometric  information  may  sell,  lease,  trade,  or
24    otherwise  profit  from  a  person's  or  a  customer's  biometric
25    identifier  or  biometric  information.
26       (d)  No  private  entity  in  possession  of  a  biometric

09500SB2400ham001              -6-        LRB095 19768 RPM 51505 a

1    identifier or biometric information may disclose, redisclose,
2    or otherwise disseminate a person's or a customer's biometric
3    identifier or biometric information unless:

4         (1)  the  subject  of  the  biometric  identifier  or
5         biometric information or the subject's legally authorized
6         representative consents to the disclosure or redisclosure;

7         (2)  the  disclosure  or  redisclosure  completes  a
8         financial  transaction  requested  or  authorized  by  the
9         subject  of  the  biometric  identifier  or  the  biometric
10        information  or  the  subject's  legally  authorized
11        representative;

12        (3) the disclosure or redisclosure is required by State
13        or federal law or municipal ordinance; or

14        (4)  the  disclosure  is  required  pursuant  to  a  valid
15        warrant  or  subpoena  issued  by  a  court  of  competent
16        jurisdiction.

17   (e)  A  private  entity  in  possession  of  a  biometric
18   identifier or biometric information shall:

19        (1) store, transmit, and protect from disclosure all
20        biometric identifiers and biometric information using the
21        reasonable  standard  of  care  within  the  private  entity's
22        industry; and

23        (2) store, transmit, and protect from disclosure all
24        biometric  identifiers  and  biometric  information  in  a
25        manner that is the same as or more protective than the
26        manner in which the private entity stores, transmits, and

1       protects other confidential and sensitive information.

2       Section 20. Right of action. Any person aggrieved by a
3    violation of this Act shall have a right of action in a State
4    circuit court or as a supplemental claim in federal district
5    court against an offending party. A prevailing party may
6    recover for each violation:

7           (1) against a private entity that negligently violates
8        a provision of this Act, liquidated damages of $1,000 or
9        actual damages, whichever is greater;

10          (2) against a private entity that intentionally or
11       recklessly violates a provision of this Act, liquidated
12       damages of $5,000 or actual damages, whichever is greater;

13          (3) reasonable attorneys' fees and costs, including
14       expert witness fees and other litigation expenses; and

15          (4) other relief, including an injunction, as the State
16       or federal court may deem appropriate.

17       Section 25. Construction.

18       (a) Nothing in this Act shall be construed to impact the
19    admission or discovery of biometric identifiers and biometric
20    information in any action of any kind in any court, or before
21    any tribunal, board, agency, or person.

22       (b) Nothing in this Act shall be construed to conflict with
23    the X-Ray Retention Act, the federal Health Insurance
24    Portability and Accountability Act of 1996 and the rules

09500SB2400ham001          -8-          LRB095 19768 RPM 51505 a

1    promulgated under either Act.

2        (c) Nothing in this Act shall be deemed to apply in any

3    manner to a financial institution or an affiliate of a

4    financial institution that is subject to Title V of the federal

5    Gramm-Leach-Bliley Act of 1999 and the rules promulgated

6    thereunder.

7        (d) Nothing in this Act shall be construed to conflict with

8    the Private Detective, Private Alarm, Private Security,

9    Fingerprint Vendor, and Locksmith Act of 2004 and the rules

10   promulgated thereunder.

11       Section 30. Home rule. Any home rule unit of local

12   government, any non-home rule municipality, or any non-home

13   rule county within the unincorporated territory of the county

14   may enact ordinances, standards, rules, or regulations that

15   protect biometric identifiers and biometric information in a

16   manner or to an extent equal to or greater than the protection

17   provided in this Act. This Section is a limitation on the

18   concurrent exercise of home rule power under subsection (i) of

19   Section 6 of Article VII of the Illinois Constitution.

20       Section 35. Biometric Information Privacy Study Committee.

21       (a) The Department of Human Services, in conjunction with

22   Central Management Services, subject to appropriation or other

23   funds made available for this purpose, shall create the

24   Biometric Information Privacy Study Committee, hereafter

09500SB2400ham001               -9-          LRB095 19768 RPM 51505 a

1   referred to as the Committee. The Department of Human Services,

2   in conjunction with Central Management Services, shall provide

3   staff  and  administrative  support  to  the  Committee.  The

4   Committee shall examine (i) current policies, procedures, and

5   practices used by State and local governments to protect an

6   individual  against  unauthorized  disclosure  of  his  or  her

7   biometric identifiers and biometric information when State or

8   local government requires the individual to provide his or her

9   biometric identifiers to an officer or agency of the State or

10  local  government;  (ii)  issues  related  to  the  collection,

11  destruction,  security,  and  ramifications  of  biometric

12  identifiers, biometric information, and biometric technology;

13  and (iii) technical and procedural changes necessary in order

14  to  implement  and  enforce  reasonable,  uniform  biometric

15  safeguards by State and local government agencies.

16      (b)  The  Committee  shall  hold  such  public  hearings as it

17  deems  necessary  and  present  a  report  of  its  findings  and

18  recommendations to the General Assembly before January 1, 2009.

19  The Committee may begin to conduct business upon appointment of

20  a majority of its members. All appointments shall be completed

21  by 4 months prior to the release of the Committee's final

22  report. The Committee shall meet at least twice and at other

23  times at the call of the chair and may conduct meetings by

24  telecommunication, where possible, in order to minimize travel

25  expenses. The Committee shall consist of 27 members appointed

26  as follows:

09500SB2400ham001             -10-        LRB095 19768 RPM 51505 a

1        (1) 2 members appointed by the President of the Senate;

2        (2) 2 members appointed by the Minority Leader of the
3    Senate;

4        (3) 2 members appointed by the Speaker of the House of
5    Representatives;

6        (4) 2 members appointed by the Minority Leader of the
7    House of Representatives;

8        (5) One member representing the Office of the Governor,
9    appointed by the Governor;

10        (6) One member, who shall serve as the chairperson of
11    the Committee, representing the Office of the Attorney
12    General, appointed by the Attorney General;

13        (7) One member representing the Office of the Secretary
14    of the State, appointed by the Secretary of State;

15        (8) One member from each of the following State
16    agencies appointed by their respective heads: Department
17    of Corrections, Department of Public Health, Department of
18    Human Services, Central Management Services, Illinois
19    Commerce Commission, Illinois State Police; Department of
20    Revenue;

21        (9) One member appointed by the chairperson of the
22    Committee, representing the interests of the City of
23    Chicago;

24        (10) 2 members appointed by the chairperson of the
25    Committee, representing the interests of other
26    municipalities;

09500SB2400ham001             -11-        LRB095 19768 RPM 51505 a

1            (11) 2 members appointed by the chairperson of the
2        Committee, representing the interests of public hospitals;
3        and
4            (12) 4 public members appointed by the chairperson of
5        the Committee, representing the interests of the civil
6        liberties community, the electronic privacy community, and
7        government employees.
8        (c) This Section is repealed January 1, 2009.


9        Section 99. Effective date. This Act takes effect upon
10    becoming law.".

# Exhibit D

# WEBSTER'S
## Contemporary
## School & Office
## Dictionary

• More than 70,000 definitions •
• Up-to-date and easy-to-use •

Created in Cooperation with the Editors of
MERRIAM-WEBSTER

# Webster's Contemporary School & Office Dictionary

Created in Cooperation with the Editors of
MERRIAM-WEBSTER



FEDERAL
STREET
PRESS

A Division of Merriam-Webster, Incorporated
Springfield, Massachusetts

Copyright © by Merriam-Webster, Incorporated

Federal Street Press is a trademark of Federal Street Press,
a division of Merriam-Webster, Incorporated.

All rights reserved.  No part of this book covered by the copyrights hereon
may be reproduced or copied in any form or by any means — graphic,
electronic, or mechanical, including photocopying, taping,
or information storage and retrieval systems —
without written permission of the publisher.

This 2008 edition published by
Federal Street Press
A Division of Merriam-Webster, Incorporated
P.O. Box 281
Springfield, MA 01102

Federal Street Press books are available for bulk purchase for
sales promotion and premium use.
For details write the manager of special sales,
Federal Street Press, P.O. Box 281, Springfield, MA 01102

**ISBN 13**   978-1-59695-047-4

**ISBN 10**   1-59695-047-1

Printed in the United States of America

08  09  10  11  12          5  4  3  2  1

**pho·to·chem·i·cal** \ˌfō-tō-ˈke-mi-kəl\ *adj* : of, relating to, or resulting from the chemical action of radiant energy

**pho·to·com·pose** \-kəm-ˈpōz\ *vb* : to compose reading matter for reproduction by means of characters photographed on film — **pho·to·com·po·si·tion** \-ˌkäm-pə-ˈzi-shən\ *n*

**pho·to·copy** \ˈfō-tə-ˌkä-pē\ *n* : a photographic reproduction of graphic matter — **photocopy** *vb*

**pho·to·elec·tric** \ˌfō-tō-i-ˈlek-trik\ *adj* : relating to an electrical effect due to the interaction of light with matter — **pho·to·elec·tri·cal·ly** \-tri-k(ə-)lē\ *adv*

**photoelectric cell** *n* : a device whose electrical properties are modified by the action of light

**pho·to·en·grave** \ˌfō-tō-in-ˈgrāv\ *vb* : to make a photoengraving of

**pho·to·en·grav·ing** *n* : a process by which an etched printing plate is made from a photograph or drawing; *also* : a print made from such a plate

**photo finish** *n* : a race finish so close that a photograph of the finish is used to determine the winner

**pho·tog** \fə-ˈtäg\ *n* : PHOTOGRAPHER

**pho·to·gen·ic** \ˌfō-tə-ˈje-nik\ *adj* : eminently suitable esp. aesthetically for being photographed

**pho·to·graph** \ˈfō-tə-ˌgraf\ *n* : a picture taken by photography — **photograph** *vb* — **pho·tog·ra·pher** \fə-ˈtä-grə-fər\ *n*

**pho·tog·ra·phy** \fə-ˈtä-grə-fē\ *n* : the art or process of producing images on a sensitive surface (as film or a CCD chip) by the action of light — **pho·to·graph·ic** \ˌfō-tə-ˈgra-fik\ *adj* — **pho·to·graph·i·cal·ly** \-fi-k(ə-)lē\ *adv*

**pho·to·gra·vure** \ˌfō-tə-grə-ˈvyu̇r\ *n* : a process for making prints from an intaglio plate prepared for photographic methods

**pho·to·li·thog·ra·phy** \ˌfō-tō-li-ˈthä-grə-fē\ *n* : the process of photographically transferring a pattern to a surface for etching (as in making an integrated circuit)

**pho·tom·e·ter** \fō-ˈtä-mə-tər\ *n* : an instrument for measuring the intensity of light — **pho·to·met·ric** \ˌfō-tə-ˈme-trik\ *adj* — **pho·tom·e·try** \fō-ˈtä-mə-trē\ *n*

**pho·to·mi·cro·graph** \ˌfō-tə-ˈmī-krə-ˌgraf\ *n* : a photograph of a microscope image — **pho·to·mi·crog·ra·phy** \-mī-ˈkrä-grə-fē\ *n*

**pho·ton** \ˈfō-ˌtän\ *n* : a quantum of electromagnetic radiation

**photo op** *n* : a situation or event that lends itself to the taking of pictures which favor the individuals photographed

**pho·to·play** \ˈfō-tō-ˌplā\ *n* : MOTION PICTURE

**pho·to·sen·si·tive** \ˌfō-tə-ˈsen-sə-tiv\ *adj* : sensitive or sensitized to the action of radiant energy

**pho·to·sphere** \ˈfō-tə-ˌsfir\ *n* : the luminous surface of a star — **pho·to·spher·ic** \ˌfō-tə-ˈsfir-ik, -ˈsfer-\ *adj*

**pho·to·syn·the·sis** \ˌfō-tō-ˈsin-thə-səs\ *n* : the process by which chlorophyll-containing plants make carbohydrates from water and from carbon dioxide in the air in the presence of light — **pho·to·syn·the·size** \-ˌsīz\ *vb* — **pho·to·syn·thet·ic** \-ˌsin-ˈthe-tik\ *adj*

**phr** *abbr* phrase

¹**phrase** \ˈfrāz\ *n* 1 : a brief expression 2 : a group of two or more grammatically related words that form a sense unit expressing a thought

²**phrase** *vb* **phrased; phras·ing** : to express in words

**phrase·ol·o·gy** \ˌfrā-zē-ˈä-lə-jē\ *n, pl* **-gies** : a manner of phrasing : STYLE

**phras·ing** *n* : style of expression

**phre·net·ic** *archaic var of* FRENETIC

**phren·ic** \ˈfre-nik\ *adj* : of or relating to the diaphragm \⁓ nerves\

**phre·nol·o·gy** \fri-ˈnä-lə-jē\ *n* : the study of the conformation of the skull based on the belief that it indicates mental faculties and character traits

**phy·lac·tery** \fə-ˈlak-tə-rē\ *n, pl* **-ter·ies** 1 : one of two small square leather boxes containing slips inscribed with scripture passages and traditionally worn on the left arm and forehead by Jewish men during morning weekday prayers 2 : AMULET

**phy·lum** \ˈfī-ləm\ *n, pl* **phy·la** \-lə\ [NL, fr. Gk *phylon* tribe, race] : a major category in biological classification esp. of animals that ranks above the class and below the kingdom; *also* : a group (as of people) apparently of common origin

**phys** *abbr* 1 physical 2 physics

¹**phys·ic** \ˈfi-zik\ *n* 1 : the profession of medicine 2 : MEDICINE; *esp* : PURGATIVE

²**physic** *vb* **phys·icked; phys·ick·ing** : PURGE 2

¹**phys·i·cal** \ˈfi-zi-kəl\ *adj* 1 : of or relating to nature or the laws of nature 2 : material as opposed to mental or spiritual 3 : of, relating to, or produced by the forces and operations of physics 4 : of or relating to the body — **phys·i·cal·ly** \-k(ə-)lē\ *adv*

²**physical** *n* : PHYSICAL EXAMINATION

**physical education** *n* : instruction in the development and care of the body ranging from simple calisthenics to training in hygiene, gymnastics, and the performance and management of athletic games

**physical examination** *n* : an examination of the bodily functions and condition of an individual

**phys·i·cal·ize** \ˈfi-zə-kə-ˌlīz\ *vb* **-ized; -iz·ing** : to give physical form or expression to

**physical science** *n* : any of the sciences (as physics and astronomy) that deal primarily with nonliving materials — **physical scientist** *n*

**physical therapy** *n* : the treatment of disease by physical and mechanical means (as massage, exercise, water, or heat) — **physical therapist** *n*

**phy·si·cian** \fə-ˈzi-shən\ *n* : a doctor of medicine

**physician's assistant** *n* : a person certified to provide basic medical care usu. under a licensed physician's supervision

**phys·i·cist** \ˈfi-zə-sist\ *n* : a scientist who specializes in physics

**phys·ics** \ˈfi-ziks\ *n* [L *physica*, pl., natural sciences, fr. Gk *physika*, fr. *physis* growth, nature, fr. *phyein* to bring forth] 1 : the science of matter and energy and their interactions 2 : the physical properties and composition of something

**phys·i·og·no·my** \ˌfi-zē-ˈäg-nə-mē\ *n, pl* **-mies** : facial appearance esp. as a reflection of inner character

**phys·i·og·ra·phy** \ˌfi-zē-ˈä-grə-fē\ *n* : geography dealing with physical features of the earth — **phys·io·graph·ic** \ˌfi-zē-ō-ˈgra-fik\ *adj*

**phys·i·ol·o·gy** \ˌfi-zē-ˈä-lə-jē\ *n* 1 : a branch of biology dealing with the functions and functioning of living matter and organisms 2 : functional processes in an organism or any of its parts — **phys·i·o·log·i·cal** \-zē-ə-ˈlä-ji-kəl\ *or* **phys·i·o·log·ic** \-jik\ *adj* — **phys·i·o·log·i·cal·ly** \-ji-k(ə-)lē\ *adv* — **phys·i·ol·o·gist** \-zē-ˈä-lə-jist\ *n*

**phys·io·ther·a·py** \ˌfi-zē-ō-ˈther-ə-pē\ *n* : PHYSICAL THERAPY — **phys·io·ther·a·pist** \-pist\ *n*

**phy·sique** \fə-ˈzēk\ *n* : the build of a person's body : bodily constitution

**phy·to·chem·i·cal** \ˌfī-tō-ˈke-mi-kəl\ *n* : a chemical compound occurring naturally in plants

**phy·to·plank·ton** \ˈfī-tō-ˌplaŋk-tən\ *n* : plant life of the plankton

**pi** \ˈpī\ *n, pl* **pis** \ˈpīz\ 1 : the 16th letter of the Greek alphabet — Π or π 2 : the symbol π denoting the ratio of the circumference of a circle to its diameter; *also* : the ratio itself equal to approximately 3.1416

**PI** *abbr* private investigator

**pi·a·nis·si·mo** \ˌpē-ə-ˈni-sə-ˌmō\ *adv or adj* : very softly — used as a direction in music

**pi·a·nist** \pē-ˈa-nist, ˈpē-ə-\ *n* : a person who plays the piano

¹**pi·a·no** \pē-ˈä-nō\ *adv or adj* : SOFTLY — used as a direction in music

²**piano** \pē-ˈa-nō\ *n, pl* **pianos** [It, short for *pianoforte*, fr. *gravicembalo col piano e forte*, lit., harpsichord with soft and loud; fr. the fact that its tones could be varied in loudness] : a musical instrument having steel strings sounded by felt-covered hammers operated from a keyboard

**pi·ano·forte** \pē-ˌa-nō-ˈfȯr-ˌtā, -tē; pē-ˈa-nə-ˌfȯrt\ *n* : PIANO

**pi·as·tre** *also* **pi·as·ter** \pē-ˈas-tər\ *n* — see *pound* at MONEY table

**pi·az·za** \pē-ˈa-zə, *esp for 1* -ˈat-sə\ *n, pl* **piazzas** *or* **pi·az·ze** \-ˈat-(ˌ)sā, -ˈät-\ [It, fr. L *platea* broad street] 1 : an open square esp. in an Italian town 2 : a long hall with an arched roof 3 *dial* : VERANDA, PORCH

**pi·broch** \ˈpē-ˌbräk\ *n* : a set of variations for the bagpipe

**pic** \ˈpik\ *n, pl* **pics** *or* **pix** \ˈpiks\ 1 : PHOTOGRAPH 2 : MOTION PICTURE

# Exhibit E

IN THE CIRCUIT COURT OF THE
TWENTY-THIRD JUDICIAL CIRCUIT
DEKALB COUNTY, CHANCERY DIVISION


BRENT CAMERON, Individually,    )
and on behalf of all others     )
similarly situated,             )
                                )
                                )
        Plaintiffs,             )
                                )
    vs.                         ) No. 2019-CH-000013
                                )
                                )
POLAR TECH INDUSTRIES, INC.,    )
and ADP LLC,                    )
                                )
                                )
        Defendants.             )


TRANSCRIPT OF PROCEEDINGS at the

hearing of the above-entitled cause before THE

HONORABLE BRADLEY WALLER, Judge of said Court,

in Room 300 of the Dekalb County Courthouse,

133 West State Street, Sycamore, Illinois, on

August 23, 2019, at the hour of 10:00 a.m.


REPORTED BY:  Nohemi Salazar-Pitts, CSR
LICENSE NO.:  084-4648

```
 1        APPEARANCES:

 2            STEPHAN ZOURAS, LLP, by
              MS. HALEY R. JENKINS and
 3            MR. RYAN F. STEPHAN
              100 N Riverside Plaza
 4            Suite 2150
              Chicago, Illinois  60606
 5            (312) 233-1550
              hjenkins@stephanzouras.com
 6            rstephan@stephanzouras.com

 7                    Appeared on behalf of the
                      Plaintiff and the Putative Class;
 8

 9            JENNER & BLOCK, LLP, by
              MR. DAVID C. LAYDEN
10            353 North Clark Street
              Chicago, Illinois  60654-3456
11            312.922.9350
              dlayden@jenner.com
12
                      Appeared on behalf of the
13                    Defendant ADP LLC;

14
              O'HAGAN MEYER, by
15            MR. THOMAS BOWERS
              One East Wacker Drive
16            Suite 3400
              Chicago, Illinois  60601
17            312.422.6100
              tbowers@ohaganmeyer.com
18

19                    Appeared on behalf of Defendant
                      Polar Tech Industries, Inc.
20

21

22

23

24
```

```
 1              THE COURT:  All right.

 2              THE CLERK:  Cameron v Polar Tech.

 3              THE COURT:  Do you want to stay there?

 4    You don't have to.

 5              MR. LAYDEN:  Whatever you prefer, your

 6    Honor.

 7              THE COURT:  As long as you speak up, I

 8    have no problem if you'd like to stay right there.

 9                   I'd like you to identify yourselves

10    from my left to my right, please.

11              MR. BOWERS:  Thomas Bowers on behalf of

12    Polar Tech.

13              MR. LAYDEN:  Good morning, your Honor.

14    David Layden on behalf of ADP.

15              MS. JENKINS:  Haley Jenkins on behalf of

16    the Plaintiffs.

17              MR. STEPHAN:  Good morning, Judge.  Ryan

18    Stephan on behalf of Plaintiffs.

19              THE COURT:  Did you have something you

20    wanted to tender to me?

21              MR. LAYDEN:  No, your Honor.  If you

22    prefer that we step up, we're happy to do it.

23    Whatever you'd like us to do.

24              THE COURT:  Whatever you guys want to do.
```

Page 4

1    If you want to have a seat and argue from there,

2    that's perfectly fine.  All right?

3              So what's before the court is motions

4    to dismiss.  Polar Tech has brought a motion under

5    2-619.1, which, we all know, is a dual motion

6    including 615 and 619.  Essentially, their motion

7    is predicated under (a)(5) statute of limitations

8    issue as well as long as (a)(9), and then ADP has

9    filed a 2-615 motion.  There is joint response

10   filed by the Plaintiff.  There's respective

11   replies.  I have had the opportunity to review

12   everything.

13             Who would like to go first on the

14   Defendants' side?

15        MR. LAYDEN:  Your Honor --

16        THE COURT:  And you can have a seat, by

17   the way.  You don't have to stand.  Thank you.

18        MR. LAYDEN:  Your Honor, we flipped a

19   coin, and I will go first.

20        THE COURT:  All right.

21        MR. LAYDEN:  Your Honor, as -- and I will

22   obviously repeat a little bit just to try to

23   summarize the high points.  ADP's motion first, of

24   all directed, at the Section 15(b) claim of BIPA,

1   which is the portion of BIPA which requires that

2   an entity collecting biometric information covered

3   by the statute provide written notice and consent

4   and obtain written consent or written release.

5              Your Honor, the basis for our motion

6   is that the way that the plain language of the

7   statute is structured, you read the entire

8   statute, you focus on 15(b), is that 15(b) applies

9   only to the entity, we think, collecting the data.

10  This is not applied to any entity that is in

11  possession of the data.

12             And our position is in this case the

13  Plaintiff has alleged, and it's practically

14  Plaintiff's employer, Polar Tech, which actually

15  collected the data.  And obviously the employer

16  had control of the workplace, which required that

17  its employees use the biometric and therefore is

18  the collector.

19             We certainly, of course, as we

20  indicate, don't think it is a valid claim against

21  Polar Tech, but we do believe that if anyone is

22  subject to 15(b), it would be Polar Tech.  We

23  think that that is clear from the plain language

24  of statute.

1          It's also important, Judge, to focus

2    on the definition of "written release," which is

3    set forth in BIPA, which provides that a written

4    release in the context of employment is a release

5    executed as a condition of employment.

6          And we think, your Honor, that that

7    further affirms our reading of the statute, which

8    is that when you have an employer using biometric

9    technology in the workplace that is covered by the

10   statute, that it is the employer's job to obtain

11   and to provide written notice to get the consent.

12          Plaintiff's position as set forth in

13   their response is basically that any entity that

14   comes into possession of biometric data at any

15   point in time is subject to 15(b).  We don't think

16   that's right, your Honor, because, first of all,

17   it would serve to destroy the careful distinction

18   that the general assembly made in using words like

19   "collect" versus "possess."

20          If that's really what the legislature

21   intended, they would have just simply said "any

22   entity coming into possession of biometric data

23   needs to get notice and get consent."  That's not

24   what the legislation said, and we think that's

 1   very important to recognize.

 2              The Plaintiffs also focused on the

 3   word "obtain," or actually it said the words

 4   "otherwise obtain" at the end of 15(b), and

 5   suggested that that's essentially just akin to

 6   coming into possession.  We don't agree with them,

 7   first of all, in line with what I just said, which

 8   is that it would collapse the distinction that the

 9   legislature made.

10              And second of all, the word

11   "otherwise obtain" comes at the end of a string of

12   other words, "capture," "collect," which all

13   involve, essentially, an active process of

14   obtaining information from the actual individual

15   who has the biometric data, and therefore we think

16   that it needs to be read consistently with that,

17   meaning an interaction with the person who has the

18   biometric data and the opportunity to give notice

19   and obtain release, if that is required.

20              And for all those reasons, we don't

21   believe that the 15(b) claim can stand.  And if

22   you look at the complaint, your Honor, it's pretty

23   clear that the specific allegations in the

24   complaint are that Polar Tech was the entity

 1   collecting.

 2              Certainly, the Plaintiff has included

 3   some general allegations that each Defendant or

 4   that Defendants actively collected.  But I think

 5   if you look at the Plaintiff's theory of the case

 6   is that Polar Tech used the clock in the workplace

 7   to obtain the employees' biometric information and

 8   then it was later, according to Plaintiffs,

 9   disclosed to ADP, meaning that ADP was not

10   collecting; ADP was receiving it afterwards.

11   That's the theory that we believe is set forth in

12   the complaint.  And we believe that that

13   forecloses the Plaintiff from a pleading, a claim,

14   against ADP under Section 15(b).

15              We also would move to dismiss the

16   Section 15(a) claim, your Honor, and that is the

17   one that requires an entity in possession of

18   biometric information covered by the statute to

19   develop a written retention policy.

20              Your Honor, as we have set forth in

21   our brief, the Plaintiff had argued initially that

22   ADP violated it by not providing the policy to

23   Plaintiff.  That's not what the statute requires.

24   The Plaintiff seems to have now backed off a

Page 9

1   little bit and said we have to have a policy.

2   And, your Honor, first of all, that's not what the

3   statute requires.  The statute actually has

4   different language.  It says you must develop,

5   which to us means plainly that when you come into

6   possession of biometric information, you then must

7   develop a policy.

8              And I think just to be clear here,

9   your Honor -- and we haven't raised a 619 motion,

10  so this may have to be a summary judgment issue if

11  we don't prevail today on this.  But ADP had a

12  biometric policy in effect in October 2017.  The

13  Plaintiff started working in early 2018, so there

14  is not going to be a Section 15(a) claim against

15  ADP unless the Plaintiff is going to challenge the

16  efficacy of the policy.  I don't understand them

17  doing so, but we may have to get to that.

18             So we think that the 15(a) claim

19  fails to state a claim because they just haven't

20  alleged that ADP violated that section of BIPA.

21             And then, your Honor, finally, that

22  leaves us with the alleged claim under 15(d),

23  which is the section of BIPA that deals with

24  disclosure/disseminations.  And here what we

1   really have is a very conclusory obligation.

2           In parts of their Complaint, the

3   Plaintiff alleges that Polar Tech has collected

4   and then disclosed to ADP.  But then they say,

5   well, ADP also disclosed to cloud storage

6   providers and other vendors.  It's actually not

7   true, but for purposes of their pleading, our

8   position is that they haven't pled that that's the

9   issue.

10          THE COURT:  Can I ask you a question?

11          MR. LAYDEN:  Certainly, your Honor.

12          THE COURT:  My understanding is that you

13  concede in your, I think it's your reply, I could

14  be wrong, that there was a -- it was transmitted

15  to a third-party storage provider.

16          MR. LAYDEN:  Your Honor, I don't think we

17  did, and if we did, we misspoke, and so I

18  apologize for that.  I can tell you also --

19          THE COURT:  I want to be accurate.

20          MR. LAYDEN:  Sure.  Of course.  I can

21  tell you, and I realize that we're stepping a

22  little bit outside pleadings, your Honor; but ADP

23  does not disclose or give data to anyone else.

24  The data -- any data that ADP gets stays at ADP.

1           Plaintiffs, obviously, are entitled

2    to allege that, but I just -- I'm telling you what

3    the facts will ultimately show.

4           THE COURT:  Just give me a moment because

5    I do not want to state something that is

6    inaccurate.

7           It must have been with the -- I

8    apologize.  It must have been what the Plaintiff

9    had alleged, because I'm looking at your reply and

10   I do not see it in here.  As a matter of fact, you

11   can test that.

12          So go ahead.

13          MR. LAYDEN:  Very well, your Honor.  So

14   basically the -- so putting aside what actually

15   happened, because I appreciate in the 615 motion,

16   you need to deal with the specific facts alleged.

17   We understand that.  There is no -- there are no

18   specific facts alleged as to a

19   disclosure/dissemination.

20          And even if -- this is obviously

21   assuming, because it's not true.  Even if they

22   could allege that ADP had disseminated it to a

23   cloud storage provider, our view is that is not a

24   disclosure/dissemination because -- for two

1   reasons:  A, the dictionary definition of

2   disclosure or disseminating would mean essentially

3   to reveal something.  It's to reveal to someone

4   who does not have a right to have it.

5            And the cloud storage provider simply

6   provided, essentially, an administrative service,

7   and it would be a significant expansion of BIPA to

8   say that any time a cloud storage provider is ever

9   provided data that there needs to be, essentially,

10  disclosure consent.

11           And, actually, taking Plaintiff's

12  theory to the actual logical conclusion, I think

13  they would say that 15(b) applies to cloud storage

14  providers.  So if anyone ever were to switch

15  storage providers, they would have to somehow get

16  back and go to all the people who they collected

17  data from and get that information including

18  former employees.  So I think it becomes one

19  whirlpool very, very quickly.

20           So, your Honor, we're not contending

21  that, you know -- as Plaintiff said that, you

22  know, that ADP could do whatever they want with

23  this data, but they can't give it to -- you know,

24  they can't sell it, they can't provide it to

Page 13

1    people who -- for purposes other than what it has

2    been collected for.

3              But even assuming -- again, it's not

4    true, but even assuming ADP had used a cloud

5    storage provider, we don't believe that it

6    constitutes a disclosure or dissemination under

7    the statute.

8              As a matter of fact, it is in

9    Section 15(b) of the statute, a provision talks

10   about what happens when you transmit data and how

11   you have to deal with it when you transmit it, and

12   then if you transmit it, you're not allowed to

13   disclose it, which to us is further confirmation

14   that not every transmission of data to someone

15   else constitutes disclosure, because otherwise

16   that section doesn't make any sense.

17             So, your Honor, for those reasons --

18   and I'm obviously happy to answer any further

19   questions you have -- we don't believe that the

20   complaint alleges a sufficient claim under BIPA

21   against ADP, and we would ask that it be dismissed

22   with prejudice.

23             THE COURT:  And you're also moving to

24   dismiss the common law negligence count as well,

1   correct?

2         MR. LAYDEN:  Your Honor, we are.  And

3   obviously Plaintiff's counsel can address this.

4   I don't understand they're proceeding on that, at

5   least in other cases they have dropped that claim

6   post Rosenbach.  But we are -- to the extent they

7   are proceeding on that, we are, in fact, proposing

8   it for the reasons that we have said at this time.

9         THE COURT:  And you are also saying that

10  the statute of limitations issue which was raised

11  by the co-Defendant is premature at this point

12  because the named Plaintiff, whether you pick the

13  one-, two-, five-year statute of limitation, was

14  filed, even in the worst case, within the one-year

15  statute of limitations; is that correct.

16        MR. LAYDEN:  Your Honor, that is ADP's

17  view.  I don't want to step on Polar Tech's toes.

18        THE COURT:  I'm not -- no.  I'm the one

19  bringing it up, so you're not stepping on their

20  toes.

21        MR. LAYDEN:  You're right.  That is what

22  we believe to be the case.  But obviously Polar

23  Tech has a relationship with the Plaintiff, and

24  they are aware, obviously, of the facts relating

1   to his employment status.  So we are just not in

2   the position to say that, but based on the briefs,

3   that is what we believe.

4           THE COURT:  Okay.  Very good.

5           All right.  The way I'm going to

6   handle this is that I'm going to allow you to

7   respond to ADP, and then you get the last word on

8   your motion, and then we will move to Polar Tech.

9           You're up.

10          MS. JENKINS:  Thank you, your Honor.  ADP

11  is essentially claiming that only certain sections

12  of BIPA don't apply to it, but the plain language

13  of the statute makes clear that it applies to all

14  private entities that come into possession or that

15  obtained this data, and to private entities as

16  defined by the statute.

17          THE COURT:  Can I ask you this question?

18  What data is ADP actually acquiring?

19          MS. JENKINS:  Well, your Honor, ADP is

20  the manufacturer of the clock, the manufacturer of

21  the software, and is additionally supporting the

22  services, and they're obtaining whatever data that

23  clock is taking from the Plaintiff.  So when he

24  puts his fingerprint on the clock and it takes

1    that fingerprint data from him, that's the data

2    that they're obtaining.

3         THE COURT:  Okay.  But -- and I know a

4    little bit about this, I think, but, I mean,

5    there's different ways to obtain data.  So you can

6    have the data that I think is contemplated by the

7    statute which is that you have somebody's

8    biometric information in the form of a fingerprint

9    or a retina scan, et cetera, as defined, or you

10   can have data that -- I don't know if you're

11   familiar with the terminology of a hash function

12   where a hash function is essentially, as I have

13   always looked at it as, is it's kind of like

14   gibberish, it's encrypted, it's something that --

15   it's like, you know, your password.

16             So if you type in your password, you

17   know, "I love mom," the hash function recognizes

18   that, but it doesn't recognize it word-for-word.

19   So it seems to me it begs the first question:

20   What data, in your view, is ADP actually acquiring

21   from your client?

22        MS. JENKINS:  Well, your Honor, the first

23   part is that they may be acquiring his actual

24   biometric identifier, his actual fingerprint; but

1   the statute also contemplates biometric

2   information, which is any information derived from

3   that fingerprint.

4           So even if -- and I'm going to

5   anticipate ADP would argue that they're collecting

6   some encrypted mathematical template of his -- of

7   the fingerprint scan the Plaintiff puts on the

8   time clock.  But that is biometric information,

9   and that is data that they're collecting.

10          THE COURT:  So you think the statute is

11  broad enough to encompass and include encrypted or

12  hash functions?

13          MS. JENKINS:  I do.

14          THE COURT:  Go ahead.

15          MR. STEPHAN:  And, Judge, if I can add

16  one thing on that.

17          THE COURT:  Yes.

18          MR. STEPHAN:  And this is sort of how

19  computers work, right?  If you look at any image

20  on your computer, there are numbers behind it.

21  That's how the computers communicate.  So they

22  don't -- it's not like a hard copy fingerprint

23  that you would see at a police office.  So it's

24  how computers communicate, and we clearly believe

1    that's contemplated by the statute.

2         THE COURT:  But, to your point, they

3    communicate by use of digits, they communicate by

4    use of codes.  So, you know, you could look at the

5    data collected by virtue of the fingerprint or the

6    retina scan and have absolutely no idea what

7    you're looking at.

8              You believe that's contemplated by

9    the statute?

10        MR. STEPHAN:  Well, I don't believe that

11   your first part of that is necessarily accurate.

12   Anything that is encrypted can be unencrypted, and

13   oftentimes numbers represent other things.  So we

14   do feel like that is included by the statute and

15   we feel that it is under the definition of

16   biometric information covered by the statute.

17        THE COURT:  What section would you direct

18   my attention to, of the statute?

19        MS. JENKINS:  In Section 14/10 is the

20   definition of biometric information.

21        THE COURT:  So your position is

22   biometric -- the biometric identifier and the

23   biometric information, those two coupled together

24   would include encrypted/unencrypted, hash

1   functions, et cetera?

2         MS. JENKINS:  Yes.

3         THE COURT:  And your position would be

4   under biometric information means any information

5   regardless of how it's been captured, converted,

6   stored, or shared?

7         MS. JENKINS:  Exactly.

8         THE COURT:  Go ahead.  By the way, do you

9   have the case on that?

10        MS. JENKINS:  I'm sorry?

11        THE COURT:  Do you have a case or cases

12  on that?

13        MS. JENKINS:  Not yet.  It's still being

14  litigated.

15             But, your Honor --

16        THE COURT:  I don't ask questions I don't

17  know answers to, but ahead.

18        MS. JENKINS:  So, your Honor, I think one

19  of the important things to remember is that ADP

20  bases its entire business model on the fact that

21  it's collecting this data, sets out to collect

22  this data because it creates the time clocks that

23  do it and software that goes along with it.  It

24  integrates those programs into it's various HR and

Page 20

1   payroll functions that it provides to various

2   employers, and it profits from all of this.

3           So to call them not a collector of

4   the data, we just think would simply inaccurate.

5   It's actually one of the biggest collectors of

6   this type of data, which means it should be the

7   most knowledgeable in this space, the most

8   experienced.  It's one of the most vulnerable if

9   attacked, and it's the most culpable here as well.

10  And yet they did nothing absolutely to comply with

11  BIPA.

12          We are at a Section 2-615 motion to

13  dismiss stage, and if you look simply at the

14  pleadings with respect to Section 15(a), we

15  allege, and ADP hasn't really disputed that they

16  possessed the Plaintiff's biometric data.

17          We alleged that they didn't have a

18  written publically available retention and

19  destruction policy, and if discovery bears out

20  that they might have produced that prior to the

21  Plaintiff's employment, so be it, but we are

22  talking about the allegations in the pleadings

23  right now; and under the pleadings and within the

24  boundaries of the complaint, we have properly

Page 21

1    alleged a claim with respect to 15(a).

2              With respect to Section 15(b), we

3    have alleged, and they don't really dispute it,

4    that they failed to provide the requisite notice

5    under BIPA and they failed to obtain a written

6    release from our client, all before collecting his

7    biometric data.  Instead, they just want to write

8    themselves out of the statute, but as we stated

9    before, Section 15(b) applies uniformly to all

10   private entities that collect, capture, or

11   otherwise obtain this data.

12             THE COURT:  How would ADP have any sort

13   of privity or the ability to effectuate the

14   elements under B?  In other words, it talks about

15   that has to be obtained before the collection of

16   the data, correct?  So how would they be in a

17   position to do that?

18             MS. JENKINS:  They could easily implement

19   on their own device, you know, a pop-up screen

20   that comes up when the Plaintiff or another

21   individual first uses the device that says, you

22   know -- it has BIPA-compliant written disclosure

23   and asks for their written consent to do so.

24             They could also require their

 1   customers, the employers, to include them on any

 2   BIPA-complaint disclosure and a release that they

 3   provide to their employees prior to collecting the

 4   data.

 5              There are a number of ways that they

 6   could comply with the statute, but they have

 7   chosen not to.  They then want the Court to

 8   believe that collection rests only with the

 9   employer, but this position just simply makes no

10   sense.

11              That would be like saying, when the

12   minister passes around the collection plate at

13   church, only the minister is collecting the money

14   and not the church, and we all know that that's

15   not true; and that's not how data works in our

16   day-to-day lives either.  It doesn't stay with the

17   initial collector.  No data that you provide to

18   one, you know, company or to one venue generally

19   stays with that.  It's disseminated across several

20   platforms and integrated into other platforms, as

21   ADP well knows.

22              And with respect, again, to

23   Section 15(d), we have alleged that they had

24   disclosed or disseminated the Plaintiff's

1  biometric data to third parties.  And the biggest

2  contention is that the conclusions -- or their

3  allegations are conclusory, but we can't be

4  expected to know at the pleading stage where

5  everything that they have disclosed has gone and

6  who it's gone to.

7          But we do know from our own

8  investigation and from our experience in this

9  field that the data is shared or at least able to

10  be accessed across a number of different platforms

11  by a number of different parties.

12          Again, if discovery bears out that an

13  allegation turns out not to be fruitful, that's an

14  issue for a different time.  Based on the

15  pleadings we have alleged that ADP violated

16  Section 15(d).  ADP also claims that Section 15(d)

17  requires some sort of public disclosure of

18  Plaintiff's data, but the plain text of BIPA does

19  not require that.  It just requires that it be

20  disseminated or disclosed to a third party.

21          You could disclose something to a

22  third party without making it known to the public

23  at large, which is what we have alleged that they

24  have done here.

Page 24

1              So, again, your Honor, I think it's

2    important to consider that we're still at the

3    pleading stage, and based on the allegations in

4    the Complaint the Plaintiff has properly alleged

5    the violations of Sections 15(a), (b), and (d) of

6    BIPA with respect to ADP.

7              THE COURT:  Anything else?

8              MS. JENKINS:  Not unless you have

9    questions.

10              THE COURT:  Do you have anything?

11              MR. STEPHAN:  No, Judge.  Thank you.

12              THE COURT:  Okay.  You get the last word.

13    It's your motion.

14              MR. LAYDEN:  Thank you, Judge.

15              So just to re-respond, and

16    actually -- well, to your questions and also to

17    what Plaintiff's counsel said; first of all, the

18    way the technology works, there is no fingerprint

19    involved.  The scanning function essentially

20    measures -- it's much, much less precise than a

21    law enforcement fingerprint, so anything that you

22    may have seen on TV or what we think of as actual

23    fingerprints, it's not involved here.

24              The scanning essentially measures a

1    few points on the fingertip, on a portion of the

2    fingertip.  It then creates this mathematical

3    template that your Honor referenced; it's

4    encrypted, it's just a series of hexadecimal

5    numbers.  That's all that it is.  There's no

6    fingerprint stored, there's no image of the

7    fingerprint stored.  It's just a series of

8    numbers.  So that's what we're dealing with here.

9                    And, your Honor, we certainly

10   disagree, and I think I may have previewed this a

11   little bit in my opening remarks.  We don't

12   believe this technology is covered by the statute.

13   We do believe, though, that there probably is

14   going to be summary judgment issues as opposed to

15   a -- or maybe a trial issue as opposed to a motion

16   to dismiss issue.

17                    So we're not at all conceding that

18   it's covered, and, your Honor, I think your

19   question goes to one of the key arguments we're to

20   be raising, which is it just simply isn't covered.

21                    A couple of other points just to

22   respond to what Plaintiff's counsel said, it's

23   actually not true that ADP manufactures the

24   clocks.  ADP doesn't.  ADP buys the clocks from a

1   company called Kronos that actually manufactures

2   them.  And that's important, your Honor, because

3   it goes to something else that Ms. Jenkins said.

4           Your Honor asked whether -- how could

5   ADP have actually obtain, provide notice and get

6   consent, and that's obviously going to be focused

7   on our briefs.  And one of the suggestions that

8   Plaintiff's counsel has alleged is we could just

9   build it in the clock software.  Well, that's

10  impossible, your Honor.  We don't write the clock

11  software; it's Kronos software.

12          So you're essentially suggesting that

13  something that we buy from someone else, we should

14  somehow be required under BIPA to reprogram, which

15  we can't because we don't actually have the source

16  code to provide this onscreen notice.

17          And then the other suggestion Ms.

18  Jenkins made was that we could just rely upon the

19  customers to provide notice and get consent.

20  Well, actually, the problem with that, your Honor,

21  is that BIPA has these $1,000, $5,000 per item

22  penalties, and that's a significant risk to ask a

23  company like ADP to run because certainly we would

24  expect that all of our clients would comply with

1   the law in every instance.

2              But when we have the plaintiffs all

3   over this country who are filing these lawsuits by

4   the dozens and hundreds, and so basically for

5   their end, for their response that they make

6   repeatedly, well, you can't just rely upon someone

7   else to take care -- or just rely upon someone

8   else to just take care of any financial liability.

9   We don't think it's workable, and frankly it's not

10  what the statute says, your Honor.  The statute

11  says that -- it talks about a collector, it talks

12  about the companies that may become in possession.

13             And, your Honor, Ms. Jenkins' used an

14  interesting analogy, the minister with the

15  collection plate, which is not one I have heard

16  before, but I actually certainly think it is

17  pretty interesting.

18        THE COURT:  Well, we have ushers in my

19  church who pass the plate.

20        MR. LAYDEN:  Yeah, I was going to say

21  that, but I thought they were ushers, and the

22  minister is not going to have much to do with the

23  ushers just passing it around.

24             But I think actually the analogy

Page 28

1   works a little bit better if you think about it

2   this way:  The minister, or the church, is Polar

3   Tech; the people passing around the collections

4   plate are the supervisors.  They are folks in

5   Polar Tech's facility who are in charge of making

6   sure its employees use these clocks to clock in

7   and out of work so they can be paid wages by Polar

8   Tech in connection with their employment of Polar

9   Tech.

10              I don't think it would be reasonable

11  for the Plaintiff to sue all those supervisors

12  individually and say that they were collecting,

13  and try to subject them to 1,000 liability.

14  Instead, I think that the way BIPA works is that

15  the entity that is actually collecting the data

16  for use in its business, which is the employer, is

17  the entity that is the collector, it's not the

18  supervisor, it's not someone like that.

19              So I think actually that analogy does

20  work if you just switch the entities out a little

21  bit.  I think that the ushers are the supervisors.

22              So, your Honor, I think for all those

23  reasons, you know, I think that the Plaintiff's

24  response doesn't really quite meet the arguments

Page 29

1    that we made in the brief.  I think that this is a

2    situation where understandably they're really

3    trying to stretch BIPA way beyond its limits in

4    terms of who is covered by this, and I really

5    think that it just creates a real practical

6    problem.

7             We should not be construing laws in

8    ways that make it impractical or impossible for

9    entities to comply, particularly where you have

10   such a draconian penalty scheme in it.  And that's

11   really what they're asking for, and it's really

12   kind of a trap for companies like ADP which are

13   marketed for selling its clocks, providing its

14   services.

15            So for those reasons, we don't think

16   there's any basis to apply 15(b) to ADP, and I

17   don't think -- I think that my remarks on 15(a)

18   and 15(d), I think, can stand; and for those

19   reasons, your Honor, we would ask that you grant

20   our motion to dismiss the claims.  Thank you.

21            THE COURT:  Thank you.  This is a very

22   intriguing area for me.  I'm going to deal with

23   the simple thing first or simple count first.  I

24   did not see that the Plaintiff gave any sort of a

1    response to the, what I'll term the common law

2    negligence claim, but to make the record clear,

3    there is a statutory provision that I believe

4    predominates, and I'm going to dismiss the common

5    law negligence claim with prejudice under

6    619(a)(9).

7                 The -- and that also addresses what

8    Polar Tech raised, but in any event, what's really

9    in play here is the statute, and the statute is

10   the Biometric Information Privacy Act found at

11   740 ILCS 14/1 at (c), and it addresses a number of

12   issues.

13                And what, however, is before me today

14   with respect to ADP is a 2-615 motion.  And as we

15   all know, 2-615 is the motion under the Code of

16   Civil Procedure that mandates that I look to the

17   four corners of the pleadings and the four corners

18   of the pleadings only, and that's what I have

19   done.

20                I'm admonished that I'm to construe

21   the complaint in the light most favorable to the

22   nonmoving party.  It's what I like to call the "so

23   what" motion.  So, what you have alleged does not

24   state a cause of action, in this case under the

1   statute that's before me.

2            So diving into this, the complaint --

3   we're going to start with, since both sides have

4   started with 15(b), I'm going to start there.

5   15(b) of the statute provides that no private

6   entity, and I really have not heard, nor did I see

7   in any of the briefs, if you will, there's no

8   dispute, there's no contest, there's no argument

9   that ADP is anything but a private entity.

10           No private entity may collect,

11  capture, purchase, receive through trade or

12  otherwise obtain a person's or a customer's

13  biometric identifier or biometric information

14  unless it first, so in other words, before, it

15  collects, captures, purchases, receives, or

16  otherwise obtains, it first must inform the

17  subject or the subject's legally authorized

18  representative in writing that a biometric

19  identifier or biometric information is being

20  collected or stored;

21           Two, informs the subject or the

22  subject's legally authorized representative in

23  writing of the specific purpose and length of term

24  for which a biometric identifier or biometric

1    information is being collected, stored, and used,

2    and receives a written release executed by the

3    subject of the biometric identifier or biometric

4    information or the subject's legally authorized

5    representative.

6              There's a definition of written

7    release, and that means informed written consent

8    or, in the context of employment, a release

9    executed by an employee as condition of

10   employment.  Although not really addressed in any

11   of the briefs, the issue of what is a -- or what's

12   the definition of a legally authorized

13   representative.  That's not set forth in the

14   statute.  Does that mean the employer?  There are

15   no cases that interpret that.

16             So I have to give effect to the plain

17   language of a statute.  I'm mandated by the

18   Appellate and Supreme Court to do that.  And the

19   best way is to look at the plain language and not

20   to excise out a particular section, but to read

21   the statute in its totality.

22             So it seems to me that trying to give

23   effect to the statute as a whole where a cause of

24   action would accrue would really be under 15(a),

1   (b), (c), (d), and (e), as to what, if you will, a

2   private entity can do with the data as defined in

3   the statute.  So to try to give effect to the

4   whole of the statute, it's this court's view that

5   15(b) only applies to an employer and not a third

6   party.

7             It seems to me that trying to give

8   effect to this, the information is, first and

9   foremost, it is a before, unless it first informs

10  the subject or the subject's legally authorized

11  representative.  And if I look at the pleading, it

12  seems to me that the intent of this section is for

13  an employer to be, if you will, responsible for

14  providing that information.  And I'm trying to

15  give effect to the definition of written release

16  in the employment context, and that by its plain

17  language states that.

18            So I always hate to be on the cutting

19  edge because that branch can get real thin real

20  quick, but unfortunately I don't see a case that

21  is directly on point interpreting this.  The

22  statute is fairly new, as we all know, but my view

23  is that it applies when it is an employment

24  situation, which is the allegation here, that it's

1    the employer's responsibility, not a third party,

2    and I'm going to grant the 2-615 motion with

3    respect to 15(b), with prejudice.

4              15(a) does not require that a private

5    entity provide an individual with anything.  It

6    is -- what it states specifically, for the record,

7    is that a private entity in possession of

8    biometric identifiers or biometric information

9    must develop a written policy made available to

10   the public establishing a retention schedule and

11   guidelines for permanently destroying biometric

12   identifiers and biometric information, and it goes

13   on.  I don't think I need to go any further.

14              But with respect to the pleadings, I

15   think there needs to be more specificity than just

16   a recitation of the statute.  But I don't think

17   the pleadings correctly or accurately state that,

18   and I'm directing everyone's attention to

19   paragraph 44, "Furthermore, each defendant fails

20   to provide employees," that's not required, but I

21   am certainly going to give, with respect to a

22   15(a) allegation, the Plaintiff the opportunity to

23   replead.  So the 615 motion will be granted,

24   however, it will be granted without prejudice.

1                15(d), this is interesting.  15(d)

2    provides that "no private entity in possession of

3    a biometric identifier or biometric information

4    may disclose, re-disclose or otherwise disseminate

5    a person's or a customer's biometric identifier or

6    biometric information, unless the subject of the

7    biometric identifier or biometric information or

8    the subject's legally authorized representative --

9    there is it is again" -- "consents to the

10   disclosure or re-disclosure, the disclosure or

11   re-disclosure completes a financial transaction

12   requested or authorized by the subject, the

13   biometric identifier, or the biometric

14   information, or the subject's legally authorized

15   representative --" it's not applicable here --

16   "the disclosure or re-disclosure is required by

17   State or Federal Law or municipal ordinance, or

18   the disclosure is required pursuant to a valid

19   warrant or subpoena issued by a court of competent

20   jurisdiction."

21                But what's in play here is no private

22   entity in possession of a biometric identifier or

23   biometric information may disclose re-disclose or

24   otherwise disseminate.  With respect to again, the

Page 36

1    four corners of the pleadings, it seems to me that

2    there are not sufficient facts, there's not

3    sufficient specificity just to say it was

4    disclosed without more.

5              And, again, like I did under (a), I'm

6    going to grant the motion; however, it's going to

7    be without prejudice to replead.  And so that will

8    be the order of the Court with respect to ADP's

9    motion.

10             You're up.

11        MR. BOWERS:  Thank you, your Honor.  And

12   I apologize, I'm also getting over a cold, so I'll

13   do my best to speak up.

14        THE COURT:  No apologies necessary.

15             Go ahead.

16        MR. BOWERS:  So given the fact that your

17   Honor has already addressed Polar Tech's argument

18   with respect to Plaintiff's Common Law negligence

19   claim, I'll just start turn my attention to the

20   statute of limitations issue that's before you.

21             We filed a Section 619 motion with

22   respect to the statute of limitations --

23        THE COURT:  (a)(5)?

24        MR. BOWERS:  Correct, (a)(5)motion.

1          As your Honor is well aware, BIPA

2     does not contain an expressed statute of

3     limitations.  This is an area that's being

4     litigated amongst circuit courts across Illinois,

5     and these lawsuits continue to be filed by

6     plaintiffs' attorneys in Northern Illinois and

7     across the state.

8          It is Polar Tech's stance that a

9     one-year statute of limitations applies to

10    Mr. Cameron's BIPA claim because BIPA is a statute

11    that is concerned with the right of privacy and

12    the protection of privacy rights.

13         Alternatively, Polar Tech submits

14    that in the event a one-year statute of

15    limitations does not apply, a two-year statute of

16    limitations applies to limit any claims of the

17    Plaintiffs and/or the putative class to two years

18    arising two years before the date of filing the

19    complaint, which in this case would be August 7th

20    of 2016.

21         Based on the fact that the Illinois

22    Supreme Court's decision in Rosenbach v Six Flags

23    effectively transformed BIPA into not only a

24    strict liability statute, but also a penal

Page 38

1   statute, as opposed to a remedial statute, as

2   Plaintiff asserts in his response brief.

3                   With respect to Polar Tech's

4   assertion that a one-year statute of limitation

5   applies -- this falls under Section 13-201 of the

6   Code of Civil Procedure, a one-year statute of

7   limitation applies in the event that there is a

8   publication --

9           THE REPORTER:  Your Honor, I need him to

10  speak up.

11          THE COURT:  Can you speak up a little bit

12  for the court reporter.

13          MR. BOWERS:  Yes.  Sorry.

14                  A one-year statute of limitation

15  applies to privacy claims in the event that there

16  is publication of the information that was, in

17  this case, purportedly collected, stored and, as

18  alleged in Plaintiff's, disseminated.

19                  In Plaintiff's Complaint, there are

20  allegations that biometric data was not only

21  collected and stored, but also disseminated to

22  third parties, ADP, and, quote, "other unknown

23  third parties."

24                  There is a case out of the First

1   District Appellate Court called Popko v

2   Continental Casualty Company.  That cite is 355

3   Ill. App. 3d 257.  It's a 2005 case out of the

4   First District.  In that case, an employee was

5   terminated from CNA Insurance, Continental

6   Casualty Insurance.

7               After undergoing a performance review

8   in which he allegedly used profanity during this

9   performance review with his supervisor.  That

10  supervisor sent a memorandum to yet another

11  supervisor, a manager within the company, and the

12  plaintiff was ultimately terminated in that case.

13              And in that case he brought a

14  defamation claim against his former employer, but

15  the focus of the court's opinion there was whether

16  or not there was publication.  And I bring this

17  particular case up, not for the defamation part of

18  the case, but to address the issue of publication.

19              In that case, the court said that

20  there was publication solely by virtue of the fact

21  that information regarding the plaintiff's

22  performance review was transmitted by his

23  supervisor who was present at that performance

24  review to another individual within the company.

Page 40

1    So in that case, an intra-office communication

2    from one individual to another, while not made

3    directly available to the public at large, can

4    constitute a publication.

5              And similarly here, that's what's

6    been alleged in Plaintiff's Complaint.  Plaintiff

7    has alleged that Polar Tech collected and stored

8    Mr. Cameron's biometric data by virtue of his

9    usage of providing scans of his finger on a time

10   clock system that was provided by ADP, and that

11   that information was then disseminated to a third

12   party, in this case ADP, and potentially to other

13   third parties.

14             BIPA itself is concerned with

15   publication, as seen in Section 15(c) and section

16   15(d).

17        THE COURT:  Can I stop and ask you a

18   question?

19        MR. BOWERS:  Sure.

20        THE COURT:  So the allegations in the

21   Complaint is that the Plaintiff was employed by

22   your client from February of 2018 until May of

23   2018, and this is a 619, so you admit all well

24   pled facts.  And this case was filed on 8/7 of

Page 41

```
 1     '18.  So would I be correct in assuming that what
 2     you're directing my attention to would be the
 3     class action component of this pleading?
 4             MR. BOWERS:  That's correct.
 5             THE COURT:  Go ahead.
 6             MR. BOWERS:  So, yes, we are directing
 7     your attention to the class action component for
 8     this particular claim as opposed to Mr. Cameron's
 9     actual dates of employment.  But as stated before,
10     BIPA does concern itself with publication in
11     Sections 15(c) and 15(d).
12             THE COURT:  But you would agree that, I
13     mean, the Complaint was filed even in the shortest
14     statute of limitation, which is a year that you're
15     asking me to consider, right?
16             MR. BOWERS:  Correct.
17             THE COURT:  Okay.  Go ahead.
18             MR. BOWERS:  I will concede the fact that
19     this complaint was filed within one year of
20     Mr. Cameron's employment.
21             THE COURT:  Okay.
22             MR. BOWERS:  But for purposes of the
23     class size, that will be determined down the road.
24     That's why I preface it now, because I don't want
```

1  to waive this argument later.

2        THE COURT:  I understand.

3        MR. BOWERS:  BIPA does prohibit parties

4  from selling and trading or profiting by

5  dissemination of a person's biometric data and

6  also prohibits parties from disclosing

7  re-disclosing, or otherwise disseminating an

8  individual's biometric data, and this signals the

9  Illinois General Assembly's intent to regulate

10  dissemination and, therefore, publication of an

11  individual's biometric data to third parties.

12        Again, publication is not required,

13  that this data be made available to the public at

14  large, or that could be made available to the

15  public at large, it requires that it's transmitted

16  to a third party.  Because Illinois takes a more

17  narrow view of what "publication" means as opposed

18  to other jurisdictions in this country.

19        So, accordingly, we submit that a

20  one-year statute of limitations applies to

21  Mr. Cameron's claim.

22        Alternatively, if the Court is

23  inclined that to opine that the one-year statute

24  of limitations does not apply, Polar Tech submits

1    that a two-year statute of limitations applies,

2    because Mr. Cameron seeks a statutory penalty in

3    its prayer for relief.

4              BIPA provides liquidated damages of

5    $1,000 per negligent violation, and $5,000 for

6    intention and/or reckless violation of the Act.

7              Plaintiff asserts that a five-year

8    statute of limitations applies to his claim

9    because BIPA does not contain an expressed statute

10   of limitations.  And while BIPA itself does not

11   contain a specific statute of limitations, unless

12   a rule to the contrary applies, then the five-year

13   statute of limitations, the catch-all provision,

14   applies.  And that's exactly what that is, a

15   catch-all, a backup, if nothing else applies.

16             Here alternatively, a two-year

17   statute of limitations would apply should the

18   one-year statute of limitations not apply, because

19   the Supreme Court's decision in Rosenbach v Six

20   Flags not only transforms BIPA into a strict

21   liability statute, it also rendered it into a

22   penal statute.

23             A statute is there for penal if it

24   imposes automatic liability or violation of its

Page 44

1    own terms, if it sets forth a predetermined amount

2    of damages, and if it imposes liability without

3    actual damages suffered by the plaintiff.

4              In Rosenbach, the Supreme Court held

5    that the plaintiff did not need to allege actual

6    damages in order to bring a claim underneath the

7    umbrella of the statute.  That is exactly what

8    happened here.

9              Plaintiff then attempts to rebut my

10   argument by saying that BIPA addresses a societal

11   concern, in this case regulating an individual's

12   privacy and their biometric data, which, fine, I

13   will concede that it may have been an intent.  But

14   a statute can both be penal and serve remedial

15   purposes.

16             In Plaintiff's response, they bring

17   up the Telephone Consumer Protection Act, and

18   whether -- in the case called Lay, whether or not

19   that statute was remedial or penal.  And in that

20   case, the court noted that the TCPA were provided

21   for treble damages, which were separate from the

22   liquidated damages contained within the statute.

23   That's a distinguishing feature from BIPA.

24             BIPA does not contain such a

Page 45

1    provision.  It provides solely liquidated damages.

2    It provides punitive and deterrent goals to

3    prevent abuse of individual -- collection of an

4    individual's biometric data.  It is

5    distinguishable from TCPA.

6              And in the event that a one-year

7    statute of limitations does not apply, because the

8    statute is penal in nature, it has deterrent and

9    punitive goals, it provides a predetermined amount

10   of damages, it imposes liability without regard

11   for actual damages as articulated by the Illinois

12   Supreme Court in Rosenbach, and it imposes

13   automatic liability for a violation of its own

14   terms, which the Illinois Supreme Court rendered

15   the statute into a strict liability statute

16   through Rosenbach.

17              This statute is penal in nature, not

18   remedial, and alternatively, a two-year statute of

19   limitations would apply to this lawsuit in

20   general, to BIPA claims in general.

21              THE COURT:  Anything else?

22              MR. BOWERS:  That's all I have.

23              THE COURT:  You will get the last word.

24              MS. JENKINS:  Thank you, your Honor.

1             We would first like to acknowledge we

2      do agree with the court.  This isn't properly at

3      issue right now.  The Plaintiff's claims were

4      filed within one year, so even assuming the short

5      statute of limitations, this complaint cannot be

6      dismissed on those grounds alone.

7             Instead, this is Defendant's improper

8      attempt to limit the class size, which it's more

9      properly handled by the motion for class

10     certification or potentially a summary judgment.

11     But regardless, as it's been noted, BIPA has no

12     self-contained statute of limitations, and

13     therefore, the statute of limitations provided by

14     735 ILCS 5/13-205, which is the default five-year

15     limitations period, should apply.

16

17

18             The one-year statute of limitations

19     does not apply here for two reasons.  First, while

20     we might allege that Plaintiff's privacy has been

21     denigrated by virtue of Polar Tech violations of

22     BIPA, the true nature of a potential liability

23     here stems from Polar Tech's violation of the

24     statute itself.  This is not an action for slander

1    or libel or publication of a matter violating the

2    right to privacy.

3              The plain and unambiguous language of

4    Section 13-201, which provides the one-year

5    statute of limitations states that it applies to

6    actions for publication of a matter violating the

7    right to privacy, which is not what's being

8    alleged here.  The defendants in these cases can't

9    have it both ways saying that publication is a

10   necessary element for the statute of limitations,

11   but dissemination only takes place if it's made to

12   the public at large.

13             The positions that have been taken,

14   and I understand that ADP and Polar Tech were

15   making separate arguments, but these types of

16   positions are inconsistent.  And further, the

17   plain and unambiguous language of BIPA doesn't

18   require us to allege publication, and therefore we

19   don't believe that BIPA falls within the one-year

20   statute of limitations period.

21             Polar Tech, alternatively declares

22   that the two-year statute applies because it

23   thinks that BIPA is a penal statute; but penal

24   statutes impose automatic liability, which BIPA

1    does not.  It sets forth a predetermined amount of

2    damages, and BIPA does contain statutory damages

3    in the event that Plaintiff doesn't recover their

4    actual damages.

5            They also claim that BIPA imposes

6    damages without regard to the actual damages

7    suffered by the Plaintiff, but that's simply not

8    true.  If you read the statute, Section 14/20

9    provides that a plaintiff can recover actual

10   damages or statutory damages, whichever is

11   greater, and, therefore, BIPA is not a penal

12   statute.

13           It is analogous to the Telephone

14   Consumer Protection Act, or TCPA, which provides

15   that a plaintiff can recover actual damages or

16   $500 per each violation, whichever is greater.

17   The language is almost the same as the language in

18   BIPA.

19           And as the Illinois Supreme Court

20   recognized in Standard Mutual Insurance Company v

21   Lay, the TCPA is not a penal statute with that

22   identical statutory language, and therefore BIPA

23   shouldn't be considered one either.

24           Rosenbach didn't make BIPA a penal

Page 49

1   statute.  It again reiterates that a plaintiff

2   could recover actual damages if they properly pled

3   and proved them or statutory damages.  And they

4   don't need to allege actual damages because the

5   statute provides statutory damages.  Therefore,

6   only the five-year statute of limitations remains.

7                   And furthermore, Judge, no case or

8   court or judge has considered this issue, directly

9   or indirectly has adopted the Defendant's

10  position.  Every court that has considered this

11  issue has ruled in favor of the five-year statute

12  of limitations.  And I recognize that none of

13  those cases are binding on this court, but we do

14  think that they're persuasive in holding that

15  several judges across both the country and the

16  state have held that the five-year statute of

17  limitations applies.

18                  And we filed with the court a notice

19  of supplemental authority.  The case Robertson v

20  Hostmark Hospitality Group, which I have copy of

21  if you need it today; and in that case Judge Cohen

22  in Cook County also held that the one-year and

23  two-year statute of limitations do not apply for

24  the reasons we have articulated, and agreed that

Page 50

1    the five-year statute of limitations period is not

2    applicable here.

3              Other cases, in ruling on motions for

4    class certification, have held that the five-year

5    statute of statute of limitations period is

6    applicable with respect to the class size, and

7    those cases are Alvarado v International Laser

8    Production Inc., Case No. 18-cv-07756 in the

9    Northern District of Illinois decided on June 19

10   of 2019; Roberson v Symphony Post Acute Network,

11   Case No. 17-L-733 in the Circuit Court of St.

12   Clair County, in March of 2019; and the Facebook

13   Biometric Privacy Litigation case pending in the

14   Northern District of California, which was

15   determined and decided in April of 2018.

16             And for these reasons, we believe

17   that the five-year statute of limitations period

18   is the one that applies to BIPA and not this

19   shorter one or two-year periods.

20             THE COURT:  Thank you.

21             Last word.

22             MR. BOWERS:  Your Honor, just a couple of

23   things to address, and I'll do my best to make

24   this quick.

1           First, Ms. Jenkins has stated earlier

2      that the allegations contained in this complaint

3      focused on the violation of the statute based on

4      the collection of biometric data.  They have also

5      alleged that this data was disseminated to third

6      parties, and BIPA itself expressly prohibits

7      dissemination and publication of data to third

8      parties.

9           That is part of the violation of

10     BIPA.  There are multiple ways to violate the

11     statute:  By profiting, by collecting, by

12     capturing, by storing, by disseminating, by

13     publishing.

14           Publishing and collecting were both

15     alleged in this complaint.  BIPA expressly

16     prohibits publishing and disseminating biometric

17     data to third party.  That was what was alleged in

18     this complaint.  So, accordingly, we would submit

19     that a one-year statute of limitations does apply

20     to this claim.

21           Secondly, with respect to the

22     argument of the two-year statute of limitations,

23     as I have stated before, this statute does contain

24     express liquidated damages based on the type of

Page 52

1    violation of the statute.  It imposes liability

2    automatically for violation of its terms based

3    upon a plain reading and interpretation of the

4    Illinois Supreme Court's decision in Rosenbach.

5              This statute has been transformed

6    into a strict liability statute, and it has been

7    transformed into a penal statute, and

8    alternatively, a two-year statute of limitations

9    should apply to a BIPA claim.

10             And, finally, I'll just bring up the

11    authority, the supplemental authority that

12    Ms. Jenkins has just brought to your attention.

13    None of these cases are -- none of these decisions

14    are binding on this court.  We have a decision out

15    of the Northern District of Illinois, at a

16    St. Clair County, and out of the Northern District

17    of California.  None of those cases, none of those

18    decisions are a binding precedent on this court.

19             And so accordingly, Polar Tech

20    submits that those decisions should be disregarded

21    as they are not binding on this court.

22             THE COURT:  Thank you.

23             Excellent job.  But as I thought

24    through this, it seems to me that this is

Page 53

1   premature.  I don't have before me anything more

2   than the complaint which pertains to the named

3   Plaintiff.  I understand why you did what you did.

4   You want to preserve this.  It is preserved.  But

5   I'm going to enter and continue my decision on

6   that until, I don't know, class certification,

7   summary judgment.

8            But certainly, in my view, the record

9   needs to be developed much more than it is, but

10  Polar Tech is in no way, shape, or form

11  prejudiced, precluded, foreclosed from addressing

12  this as we get further down the road.  So I am not

13  ruling on this.  I'll enter and continue the issue

14  for a later date.

15           That being said, how much time does

16  Plaintiff need to replead on the Counts or the

17  sections that I left up?

18           MS. JENKINS:  30 days, your Honor, if

19  that's okay with you.

20           THE COURT:  That's reasonable.  Here's

21  the offer that I will make.  Okay?  I know this is

22  isn't the only file on your respective desks.  I

23  don't believe in bringing back attorneys unless

24  we're going to accomplish something of substance,

Page 54

1   so I will throw this out.

2             I don't know what your respective

3   thoughts are, obviously, because you haven't seen

4   the amended pleading, but I'm affording you ample

5   opportunity to decide whether you're going to file

6   a motion to dismiss; I'm willing to do that.

7             You're all excellent lawyers.  You

8   can work out a briefing schedule.  I can give you

9   an outside date right now for a hearing date.  If

10  it ends up being that you file an answer, we could

11  just use that as a status date on discovery, et

12  cetera.

13            Would you like to take me up on my

14  offer.

15       MR. LAYDEN:  It's certainly fine with

16  ADP, your Honor.

17       THE COURT:  Why don't we kick this out

18  for status/argument.  How about if we go to the

19  beginning of December?  That gives each side a

20  full opportunity to work out a briefing schedule,

21  with the caveat that I get courtesy copies one

22  week before, but I'll just throw out arbitrarily

23  Wednesday, December 4th at 10:00 for argument or

24  status.

Page 55

1            MR. LAYDEN:  Your Honor, that day is not

2    terrific for me.  Any other day that week is fine.

3            THE COURT:  December the 6th?  That's a

4    Friday at 10:00.

5            MR. STEPHAN:  Judge, can we suggest maybe

6    pushing that to January.  The holidays are just --

7    I'm always jammed.

8            THE COURT:  I'm not opposed at all.

9    Might I suggest the 17th, 10:00?

10           MR. LAYDEN:  Fine with me.

11           THE COURT:  Argument or status?

12           MR. BOWERS:  Judge, I'm scheduled to be

13   out of town that day.  Is there a day that week,

14   maybe earlier that week?

15           THE COURT:  15th?

16           MR. BOWERS:  That's fine, your Honor.

17           MR. LAYDEN:  That works.

18           MR. STEPHAN:  That's good.

19           THE COURT:  Same thing.  10:00 status or

20   argument.  And then you guys work out a briefing

21   schedule.  If somebody wants to e-mail an order,

22   if it gets to that point, I'd be happy to enter

23   the order without a court appearance.  Okay?

24                   So if you'd indicate today for the

```
                                                        Page 56
 1   reasons stated on the record, and then just go

 2   from there.

 3               Anything else we can accomplish?

 4          MS. JENKINS:  No, your Honor.

 5          MR. STEPHAN:  Thank you, Judge.

 6          MR. LAYDEN:  Thanks, your Honor.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 57

```
 1   STATE OF ILLINOIS  )

 2                      )

 3   COUNTY OF C O O K  )

 4

 5           NOHEMI SALAZAR-PITTS, a Certified

 6   Shorthand Reporter doing business in and for the

 7   State of Illinois certifies that she reported in

 8   shorthand the proceedings of said hearing, and

 9   that the foregoing is a true and correct

10   transcript of her shorthand notes so taken as

11   aforesaid and contains the proceedings given at

12   said hearing.

13

14

15           _____
                 Certified Shorthand Reporter
16

17

18

19

20

21

22

23

24
```

# Exhibit F

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

JUDGE DAVID B. ATKINS

| | |
|---|---|
| FELIPE BERNAL, individually and on behalf of others similarly situated, | **AUG 23 2019** |
| Plaintiff, | Circuit Court-1879 |
| | No. 2017-CH-12364 |
| v. | Calendar 16 |
| ADP, LLC, | Judge David B. Atkins |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

THIS CASE COMING TO BE HEARD on Defendant ADP, LLC's Motion to Dismiss Plaintiff's Complaint Pursuant to 735 ILCS 5/2-615, the court, having considered the briefs submitted and being fully advised in the premises,

HEREBY FINDS AND ORDERS:

### *Background*

Plaintiff, Felipe Bernal, as an employee of Rockit Ranch Productions, Inc. ("Rockit"), was required to use biometric scanning technology to "clock-in" and "clock-out." The biometric technology was provided and serviced by Defendant ADP, LLC. Plaintiff alleges the use of his biometric identifying information during his employment with Rockit was improperly acquired, possessed, and disseminated in violation of sections 740 ILCS 14/15 (a)-(d) of the Biometric Information Privacy Act ("BIPA"). Plaintiff originally brought suit against Rockit for said violations, but he subsequently amended his Complaint to drop all allegations against Rockit and instead claim that Defendant violated BIPA. Defendant now seeks to dismiss all counts.

### *Standard of Review*

A 2-615 motion to dismiss challenges the complaint's legal sufficiency based on facial defects.[1] The court assumes all well-pleaded facts and their reasonable inferences in the complaint as true, viewing the allegations in the light most favorable to the plaintiff.[2] As Illinois is a fact-pleading jurisdiction, "a plaintiff must allege facts sufficient to bring a claim within a legally recognized cause of action."[3] Mere conclusions of law and unsupported conclusory factual allegations are insufficient to survive a 2-615 motion to dismiss.[4] A 2-615 motion to dismiss does not raise affirmative factual defenses.[5] "A

---

[1] *Beacham v. Walker*, 231 Ill. 2d 51, 57 (2008).
[2] *Alpha School Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 735 (2009).
[3] *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 355, (2004).
[4] *Alpha School Bus*, 391 Ill. App. 3d at 736.

motion to dismiss should be granted only if the plaintiff can prove no set of facts to support the cause of action asserted."[6]

<em>Discussion</em>

Count I of Plaintiff's Complaint alleges violations of four separate clauses within BIPA. The Court addresses each alleged violation separately.[7]

## Applicability of § 15(b).

Plaintiff asserts that Defendant violated § 15(b), which imposes certain preconditions that private entities must comply with before they can "collect, capture, purchase, receive through trade, or otherwise obtain" an individual's biometric information. Defendant presents a compelling argument that § 15(b) should not apply to an entity like ADP, pointing out that language included by the legislature differs from the language included in the other subsections and suggests that the legislature intended for possession alone to not be enough to make an entity subject to § 15(b). Indeed, § 15(b)'s requirement that the private entity whose actions the subsection is meant to regulate must receive a "written release" from the subject of the biometric identifier or biometric information or their legally-authorized representative does suggest that the legislature did not intend for the subsection to apply to a third party entity as Defendant seems to be here.[8] Here, Defendant is not Plaintiff's employer. While Plaintiff correctly contends that BIPA can be applied outside of an employment situation, there is nothing to suggest that BIPA was intended to apply to situations wherein the parties are without any direct relationship.[9] Moreover, from the facts as they are alleged, the Court can infer that this case fits squarely within an employment context. All of Plaintiff's claims stem from Rockit's requirement that employees participate in biometric scanning technology. That Rockit obtained the technology from Defendant does not remove Plaintiff's case from existing within the context of his employment by Rockit. As Defendant notes, to read BIPA as requiring that a third party provider of the biometric timeclock technology, without any direct relationship with its customers' employees, obtain written releases

---

[5] *Borowiec v. Gateway 2000, Inc.*, 209 Ill. 2d 376, 382 (2004).

[6] *Kaiser v. Fleming*, 315 Ill. App. 3d 921, 925, (2000).

[7] In his response to Defendant's motion to dismiss, Plaintiff represents that he "voluntarily dismisses his negligence claim (Count II) against Defendant," thus rendering as moot Defendant's motion to dismiss Count II.

[8] As Defendant notes in its motion, the BIPA's definition of "written release" clearly limits its applicability, in the context of employment, to the relationship that exists between employer and employee. 740 ILCS 14/10.

[9] In *Rosenbach v. Six Flags Entm't Corp.*, 2019 IL 123186 (2019), the Supreme Court noted that the purpose of § 15(b) is to vest "in individuals and customers the right to control their biometric information without requiring notice before collection and giving them the power to say no by withholding consent." 2019 IL 123186 at ¶34. Given the Supreme Court's interpretation of § 15(b)'s purpose, there is little reason to believe that its applicability should extend beyond the point at which an individual has the right to withhold consent. Here, Plaintiff's right to withhold consent can be exercised by refusing Rockit's authority to collect his biometric information.

from said employees would be unquestionably not only inconvenient but arguably absurd.[10]

Yet, based on the pleadings, as written, the Court's decision must ultimately turn on the insufficiency of Plaintiff's Complaint as to § 15(b). Plaintiff has failed to allege facts sufficient enough for the Court to properly assess Defendant's actual involvement, relative to the biometric scanning technology, beyond the fact that Defendant supplied Rockit with the technology. In order for the Court to determine whether or not § 15(b) is applicable here, Plaintiff's Complaint must include factual allegations of what Defendant's role relative to Plaintiff's biometric information is. Most of Plaintiff's claims that are relevant to § 15(b) are aimed at what the technology Defendant provides to Rockit allegedly does. In so far that Plaintiff's claims allege particular action on Defendant's part, the allegations are conclusive in nature.[11] Therefore, Defendant's motion to dismiss, as to the portion of Count I alleging a violation of § 15(b) of BIPA is GRANTED.

**Whether § 15(a) is Moot.**

Plaintiff alleges a breach of § 15(a), which requires private entities in possession of biometric information to:

> "develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers … when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first. Absent a valid warrant or subpoena issued by a court of competent jurisdiction, a private entity in possession of biometric information must comply with its established retention scheduled and destruction guidelines."

The language in § 15(a) seems to make clear that a private entity is required to comply with its established retention schedule and destruction guidelines whenever in possession of biometric information. The subsection seems to stipulate that the schedule and guidelines must be written and made available to the public. Therefore, if a private entity is in possession of biometric information, but lacks an established retention schedule and destruction guidelines, it stands to reason that said private entity could be found to be in violation of § 15(a).

Notwithstanding the requirement that a private entity in possession of biometric information have an established retention schedule and destruction guidelines, there is no explicit requirement that the schedule or guidelines exist "prior to" possession of the

---

[10] "It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *People v. Hanna*, 207 Ill. 2d 486, 498 (2003) (citing *Croissant v. Joliet Park Dist.*, 141 Ill. 3d 449, 455 (1990) ("Statutes are to be construed in a manner that avoids absurd or unjust results")).

[11] See Plaintiff's Complaint at ¶ 3 ("Defendant ADP is capturing, storing, using, and/or disseminating the biometrics of Plaintiff …")

biometrics information.  Yet, regarding § 15(a), Plaintiff alleges that "[p]rior to taking Plaintiff's biometrics, Defendant did not make publicly available any written policy as to a biometric retention schedule and guidelines for permanently destroying the collected biometrics."  While this may be true, such an allegation does not exclude the possibility that Defendant made available to the public an established schedule and guidelines when, and not before, it was in possession of Plaintiff's biometric information.  Plaintiff's Complaint, as written, does not sufficiently allege an actual violation of § 15(a), and thus, fails to state a claim.  Defendant's motion to dismiss, as to the portion of Count I asserting a violation of § 15(a) of BIPA is GRANTED.

**Whether Plaintiff has Sufficiently Alleged a Violation of § 15(c).**

Plaintiff alleges an infraction of § 15(c), which prohibits private entities from selling, leasing, trading, or otherwise profiting from an individual's biometric information.[12]  Here, Plaintiff's contends that the allegations in his Complaint, "when combined with reasonable inferences that can be drawn therefrom, establish that Defendant obtains and stores the biometric information captured by its devices, which it in turn sells, leases, or otherwise makes commercially available to Plaintiff's employer for the purposes of biometric timekeeping."[13]  The court disagrees.  Paragraphs 11 and 26 of Plaintiff's Complaint allege that Defendant disseminates biometric information to "third parties, including vendors for timekeeping, data storage, and payroll purposes."  Plaintiff's Complaint does not contain any allegation that Defendant sold, leased, traded, or otherwise profited from anyone's biometric information.  Thus, since Plaintiff's Complaint only alleges facts sufficient to demonstrate that Defendant passes biometric data to third party partners for purposes other than profit, Defendant's motion to dismiss as to the portion of Count I asserting a violation of § 15(c) is GRANTED.

**Whether Plaintiff has Sufficiently Alleged a Violation of § 15(d).**

Defendant provides a compelling argument regarding whether § 15(d) is even applicable in this case.  Namely, that Plaintiff's implication of Defendant's allowing biometric information to pass to data storage vendors and payroll services does not qualify as instances of "disclosure" or "dissemination" under BIPA, but rather should be considered a form of mere transmission.  However, to the extent that Defendant's argument seems to suggest an affirmative factual defense, it would be inappropriate for the Court to entertain this line of argument on a Section 2-615 motion to dismiss.

Turning to the Complaint as pled, Plaintiff asserts a violation of § 15(d), which establishes certain preconditions with which private entities must comply before they "disclose, redisclose, or otherwise disseminate a person's or a customer's biometric … information."  Only twice in Plaintiff's Complaint does he allege any such disclosure; each instance consists of a single statement that Defendant's technology "allows for and resulted in" the dissemination of Plaintiff's biometric information to third parties,

---

[12] See 740 ILCS 14/15(c).
[13] See Plaintiff's response to Defendant's motion to dismiss at pg. 8.

including vendors for timekeeping, data storage, and payroll purposes."[14]   These allegations fall short of sufficient factual pleading, because they are void of any facts to support Plaintiff's allegation that Defendant has violated § 15(d).   Suggesting that the technology Defendant created allows for the dissemination of biometric information is not an allegation of the Defendant's disseminating biometric information.   Thus, Defendant's motion to dismiss, as to the portion of Count I asserting a violation of § 15(d) is GRANTED.

WHEREFORE the Court enters an order as follows:

  a. Defendant ADP, LLC's motion to dismiss Plaintiff Felipe Bernal's Complaint is GRANTED, and Count I is dismissed *without prejudice.*

  b. Plaintiff has until September 20, 2019 to file an amended complaint, with facts consistent with this Order.

  c. This matter is set for further status to October 24, 2019 at 10:30 a.m. in courtroom 2102.

ENTERED:

JUDGE DAVID B. ATKINS

AUG 23 2019

Circuit Court-1879

Judge David B. Atkins

The Court.

---

[14] See Plaintiff's response to Defendant's motion to dismiss at ¶¶11, 26.

Page 5 of 5